UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PAUL L. FELKER, WILLIAM SCHRADER,
MICHAEL McCORMICK, ANTHONY M.
KOZLOWSKI, WILLIAM T. DUNBAR,
EDWARD R. MACIEJEWSKI, BRIAN J.
KELSO, WILLIAM VANDERGRIFT, PAUL
D. JENNINGS, DARRYL T. BRANT, FRED
J. SOBOTINCIC, ROBERT A. FORTE, JR.,
ANDREW R. GOSS, EDWIN J. ERIKSEN,
ANTHONY C. REILLY, FRANK T.
GANNON, JOHN P. GANNON, BRIAN D.
BARROWCLIFF, LEO RUSHTON,
DEONARINE JAWAHIR, CARL
HOLDERER, ROBERT A. GRANGE, and
PAUL C. MILLER
                    Plaintiffs,
         v.


USW LOCAL 10-901, USW LOCAL 10-
901(SU) AND USW LOCAL 10-901 (NE)
MARCUS HOOK REFINERY WORKERS
INVOLUNTARY TERMINATION PLAN
                    Defendant.

CIVIL ACTION NO. 13-CV-07101-JHS

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS**

1. Each of the 23 plaintiffs in this case was an employee of Sunoco, Inc. ("Sunoco"), was a member of United Steel Workers Local 10-901 ("Local 10-901"), and was assigned to Sunoco's Marcus Hook Mobile Work Force ("MWF").  Complaint and Answer ¶2.

2. As a result of Sunoco's decision to exit the refinery business, Local 10-901, the authorized bargaining representative for the Marcus Hook refinery workers (including the MWF) negotiated with Sunoco over the effects of the closing of the Marcus Hook Refinery.  Tabs 6-10.[1]

3. On February 22, 2012, Sunoco and the Union reached an agreement called the Settlement

---

1 References to "Tab #" means the tab number in the binder titled Plaintiffs' Additions to the Administrative Record.  Where bates page numbers are shown in the reference, i.e., "Tab #, bates #", the bates number is the precise bates pages within that tab.  All bates numbers are found in the lower right hand corner of the document.

Agreement between Sunoco, Inc. (R&M) and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and its Local 10-901, 10-901(SU), 10-901(NE) and their successors for the Sunoco, Inc., (R&M)'s Marcus Hook Refinery (the "Settlement Agreement"). Defendant's Administrative Record, bates D-00043-230.

4.    Pursuant to paragraph 5 of the Settlement Agreement, a severance plan was created for the refinery workers called the USW Local 10-901, USW Local 10-901(SU) AND USW Local 10-901 (NE) Marcus Hook Refinery Workers Involuntary Termination Plan ("Plan"). Defendant's Administrative Record, bates D-00029-42.

5.    The Plan was established as an employee welfare benefit plan within the meaning of §§ 3(1) and 4 of ERISA, 29 U.S.C. §§ 1002(1), 1003, and a severance pay plan as described in 29 C.F.R. §2510.3-2(b).  Defendant's Administrative Record, bates D-00039-40

6.    During the effects bargaining between Sunoco and Local 10-901 that led up to the Settlement Agreement, Sunoco expressly stated that members of the MWF would be given the option of taking layoff and severance at the same time as everyone else (when the Marcus Hook Refinery shut down at the end of February), or be temporarily transferred to work at the Philadelphia Refinery until Sunoco disposed of that refinery, and at that time get severance. Specifically:

a.       In the bargaining notes[2] dated January 19, 2012 is the following exchange (Tab 6, Bates  D-00510-511):

MM (Union Committee member Mike McLain):  Before we get started on

---

2 Sunoco has admitted in Tab 2, Request for Admission 10, that the Effects Bargaining Meeting Notes are true copies of those notes, made at or near the time of each such meeting by or from information transmitted by a person in attendance at each such meeting, maintained in the ordinary course of Sunoco's regularly conducted business and that it was Sunoco's regular practice to make or maintain such a record of such meetings.

everything else, there are some questions we asked before, about transfers to PHL…

LB (Management Committee member Liz Bilotta):  I'm in discussions.  I think we may be able to do something there, it would be temporary transfers.

MM:  What do you mean by temporary?

LB:  We don't know the outcome of Philadelphia so it would be temporary. We're not making any permanent transfers.

b.     In the bargaining notes dated February 14, 2012 are the following exchanges:

MM:  Mobile work force.  That's the first time I've seen this so what are you talking about?

LB:  We're prepared to offer for MWF employees to go to the Philadelphia refinery, on a temporary basis, and then get laid off with the Philadelphia Refinery employees, until they are laid off.

MM:  So it could be a 1 week assignment, or a 6 month assignment?

LB:  I think it would be greater than a 1 week assignment, we're expecting to run the Philadelphia refinery until June or July and we have work we can use them.  It is whoever is not retained by Marcus Hook.

MM:  Anyone who is not retained from Marcus Hook and is from the MWF can choose?  What if they don't want to go?  Will they still receive the severance?

LB:  Yes

….

LB:  We are saying that those individuals are qualified and we're willing to have them go work at Philadelphia on a temporary basis….

LB:  What I'm prepared to offer to you is that individuals who volunteered in 2009 to join the MWF will have the opportunity to go to Philadelphia and work there.

MM:  And they will remain within our book?

LB:  Yes they will remain within your book.

MM:  So they would be paid the Philadelphia rate of the MWF?

3

LB:  Yes they would be paid the same way that they are paid today.

Tab 7, Bates  D-00554.

LB hands MM *Management Proposal 5 – Mobile workforce 3:53 pm*

LB:  This is company proposal #5, MWF.  The company is offering that current MWF employees who are not retained in the Marcus Hook terminal will be given the opportunity on a temporary basis to go work at the Philadelphia refinery until they are laid off of the temporary assignment as determined by management. They will be eligible to receive Severance Benefits when they are laid off.

Tab 7, Bates D-00556.

c.      In the bargaining notes dated February 20, 2012 are the following exchanges (Tab 8, Bates D-00608-609, 612):

MM:  Nothing on MWF?

LB:  Nothing in writing but I can talk to you about that.  We had a teleconference with Demes and Jim Keeler and they are open to taking some additional people as long as it's exclusively left up to Jim Demes' picking and for us, it is the last step of staffing….  We don't know the final numbers, but there's a commitment to take some people.  Are you ok with that?

MM:  Yes, but you'll give us something formal on it.

****

In terms of the Rule of 60, I have to be clear, I don't have authorization for that. It won't be in my last best and final….  Here, with all the employees, it costs $15MM….  I know that is a hard and difficult pill to take, but I have no different answer.  It won't be in our LBF.

d.      Consistent with Ms. Bilotta's description in the bargaining notes of February 14, 2012, cited above, and the modification described in the bargaining notes of February 20, 2012, Management Proposal #5, dated February 21, 2012, which was approved by Sunoco and Local 10-901 on February 22, 2012 and ultimately was incorporated verbatim into ¶14 of the Settlement Agreement (Defendant's Administrative Record bates D-00051), provided in pertinent part (Tab 9, bates P-00059 (note that this document is

4

identical to bates D-00225, which is included in Defendant's Administrative Record):

> Bargaining Unit employees who are currently classified as Mobile Work Force (MWF) employees who are not retained to work at the Marcus Hook Terminal Facility **will be afforded the opportunity to be assigned on a *temporary* basis to work at the Philadelphia Refinery *and work until laid off from such temporary assignment as determined by management.*** Employees will be given two weeks' notice of layoff date. *Such employees will be eligible to receive enhanced Severance Benefits at the time of such layoff….*

> In the event there are open slots remaining after staffing the existing MWF employees to Philadelphia, as determined by management, the Company has total discretion to determine the number of open slots and the employees selected to staff the open slots. Selected employees will be temporarily assigned to the MWF job classification. *Such employees* will be given two weeks' notice of layoff date and ***will be eligible to receive enhanced Severance Benefits at the time of such layoff.***

> MWF employees will remain as bargaining unit members of 10-901 while on temporary assignment at the Philadelphia Refinery.

> MWF employees will receive pay in accordance with their current pay scale.

(emphasis added).

7.   The Settlement Agreement also contained the following relevant provisions:

> **5.  <u>Severance Pay and Benefits</u>**

> Bargaining unit employees who are laid off by the Company are eligible for severance pay and benefits in accordance with the [Plan}….

> To be eligible for severance, all employees must participate in a safe and orderly transition of the work as determined by the Company. An employee will not be eligible for severance benefits if he/she is discharged for just cause or leaves the Company prior to the employee's termination date as determined by the Company.

> During the term of the Transition Agreement [stated in paragraph 4 of the Settlement Agreement to be March 1, 2012 until March 1, 2014] any and all bargaining unit employees involuntarily severed as a result of layoff by the Company shall receive the negotiated severance package achieved at the Effects Bargaining Negotiations.

> **16.  <u>Expression of Interest</u>:  (Preference/Expression of Interest Letters)**

5

… The Company will establish an involuntary termination plan covered under [ERISA]….  The terms of the Plan will include the following:  An employee who is selected for termination (laid off) and who signs, does not revoke and complies with the terms of a General Release, which includes that employee will not have any recall rights is eligible to receive enhanced severance benefits….  Employees who elect an Expression of Interest that is accepted will be required to stay and perform work satisfactorily until the employee's termination date as determined by Management in order to be eligible for the Severance Pay and Benefits.

Defendant's Administrative Record bates #D-00045-46, 53.

8.      The Plan itself contains the following relevant provisions:

### II.      Guidelines for Determining Eligibility for Severance Benefits

This Plan only applies to those employees whose employment is terminated in connection with the Company's idling of the main processing units at the Refinery and transition to a terminal operation at the Refinery….
**…**

The presence of any of the following criteria will render an employee ineligible for severance benefits under the Plan, and management does not have the discretion to grant severance benefits under the Plan if any of the following criteria are present. Accordingly, severance benefits will not be applied to:

- Employees who terminate before the date specified by the Company as a condition for receiving severance benefits under the Plan, or
- Employees who voluntarily resign, or
- Employees who are being discharged for cause, or
- Employees who refuse to accept, whether with Sunoco or any of its affiliate companies, assignment to an equivalent position or a change in work location….  (This paragraph does not apply to employees who are part of the Mobile Work Force as designated by the Company in its sole discretion, and *who are transferred to a position at the Company's Philadelphia Refinery for a limited period of time*.)….

*Severance benefits also will not be paid to employees who are working at the Marcus Hook Refinery at the time it is sold to a company not in the Sunoco organization and who are offered a position with the purchaser with comparable base salary or wages.*

Defendant's Administrative Record Bates D-00030-31 (emphasis added).

### IV.      Benefits

*…* If *the Marcus Hook Refinery* is sold to a company not in the Sunoco organization,

6

and an employee who is receiving severance benefits under this Plan is subsequently hired by the purchaser in a position with comparable base wages …, all severance payments will stop at hire.

Defendant's Administrative Record bates D-00034 (emphasis added).

9.    The Plan states that:

The Plan Administrator or his delegate has full responsibility for interpreting and administering the terms and provisions of the Plan.  All interpretations, determinations and decisions of the Plan Administrator (or its delegate) in respect to any manner shall be final, conclusive and binding upon the Company, any employer, participants and all other persons claiming an interest in the Plan.

Defendant's Administrative Record bates D-00038.

10. The Plan Administrator for the Plan is Sunoco.  Complaint and Answer, ¶6; Defendant's Administrative Record bates D-00038.  The Court ruled at pp. 10-11 of its Opinion dated April 23, 2015, that Sunoco delegated its authority to administer the Plan to Vincent Brigandi.

11. Brigandi was at the relevant time Sunoco's Senior Director of Benefits and Plan Administration.  (VB dep 11).[3]

12. Brigandi's duties at the time extended to Sunoco's health and welfare plans, its 401K plan and its defined benefit pension plans.  He had, among other duties, plan design responsibilities, management and negotiation of contracts with plan vendors, management of a staff that fielded coverage questions from employees, plan audit responsibilities, and claims responsibilities.  He had both plan sponsor and plan administrator responsibilities. VB dep 15-16.

13. Brigandi understood that when he was adjudicating claims and appeals, he was acting in a fiduciary capacity with responsibility to act solely in the interest of participants and beneficiaries.  VB dep 36.

14. When asked what safeguards were in place within the structure of Sunoco to assure that

---

3 Brigandi's deposition transcript is found at Tab 72 of Plaintiffs' Additions to the Administrative Record. It will be referenced as "VB dep #", with the number being the relevant page number.

he was acting solely in the interest of participants and beneficiaries, given that he had any

number of other non-fiduciary responsibilities to his employer, Brigandi testified:

> So the way I would view a safeguard would be that I would review the claim, give it a lot of thought, do investigation into the merits of the claim, seek assistance from a legal perspective, from those that are responsible for providing legal guidance to the plan, and then make the decision on my own based on all of the facts that I was able to gather.

VB dep 37-38.  This testimony was then followed by the following question and answer:

> Q.  … what procedures or safeguards were in place to assure that the appeal was going to be given a fresh look given that you're the same person deciding the appeal, decided the original claim?
> A.  So the way I can respond to that is I'm not sure that I can say that there's a fresh look. But what does happen is when I get an appeal of my ruling, I review it as if it's a new claim.  And I go through the same facts and review as I did on the first claim, talk to the people that were involved, and then get legal advice, legal guidance from the folks that are responsible for providing legal guidance to the plan.
> Q.  Okay.  And that's all there is?  There are no other procedures?
> A.  That is correct.

VB dep 39-40.

15. Further on the subject of structural safeguards, Sunoco made the following interrogatory

responses:

> Interrogatory 6.   Describe all procedures that were put in place by Sunoco to provide safeguards against Brigandi being influenced in his decision-making with respect to the Plan by what might be best for Sunoco as plan sponsor, as opposed to what was required under the Plan in the interests of the Plan's participants and beneficiaries.
>
> [Objection deleted]
> RESPONSE:   Brigandi underwent formal training on his role as a plan administrator and the fiduciary responsibilities related to that position on three separate occasions in order to ensure that the decision-making process was safeguarded against any improper influences….  In addition, Brigandi had robust prior experience administering at least 20 different plans and adjudicating over 180 claims as of June 25, 2012.
>
> Interrogatory 7.   Explain why Sunoco delegated decision-making both with respect to initial claims under the Plan and appeals from denials of benefits to the same individual (Brigandi)
>
> [Objection deleted]
> RESPONSE:  Defendant is not obligated under ERISA to have different decision makers

8

as to the initial claim and the appeal of benefits.

Tab 1, page 12.

16. The severance benefits under the Plan are paid out of the assets of Sunoco. Tab 2, Request for Admission 1A, page 2.

17. There is no trust fund associated with the Plan to pay severance benefits. Tab 2, Request for Admission 1B, page 2.

18. In the first quarter of 2013, which was at the same time Plaintiffs' claim for benefits and appeal were being decided by Brigandi, he was asked by a Sunoco attorney (Yeechun Su) to estimate the total value of the claim. He estimated that the total potential liability to Sunoco was approximately $80,000 times approximately 25 individuals [which computes to $2,000,000.00]. VB dep 26.

19. a.        Sometime in mid February, on a Tuesday, before the Settlement Agreement was signed on February 22, 2012, the plaintiffs who were already members of the MWF (plaintiffs Felker, Schrader, Kozlowski, Jennings, Sobotincic, Forte, Goss, Eriksen, Reilly, Frank T. Gannon Jawahir, Holderer, and Miller) were told by Mike Griffin, Sunoco's general foreman for the maintenance group, that on the following Monday they should not to report to work, but instead stay home with pay awaiting termination at the end of February. At that time, Felker understood they were going to be laid off, and would receive the severance benefits that Local 10-901 was negotiating for us. On the Thursday of the week that they were home with pay, they all received individual telephone calls from Mike Griffin that the MWF was being reactivated, and we had to report to the Philadelphia Refinery the following Monday on a temporary assignment which would last until we were no longer needed, and then we would be terminated. Felker asked Mr. Griffin what would happen if he did not report. He said that if he did not report

he would be fired because it was a job assignment.  They did not discuss the severance benefit in that conversation, but Felker understood the difference between being laid off and being fired, and he assumed that if he did not accept the assignment, he would not get the severance benefit.  Griffin also told Felker that they were being assigned to the Philadelphia Refinery until the shutdown was over or it was sold.  He understood, based on what his union representatives had told him, that at the end of the assignment at the Philadelphia Refinery, they would then get the severance benefit.  By then, they had also already voted on the Settlement Agreement, which said in paragraph 14 that we would get the severance after the temporary assignment at the Philadelphia Refinery was over.  Tab 70 (Felker Verified Statement) ¶3.

b.      On February 6, 2012, plaintiff Dunbar and a group of others, including plaintiffs Michael McCormick, Edward Maciejewski, Brian Kelso, William Vandergrift, Darryl Brant, John Gannon, Brian Barrowcliff, Leo Rushton, and Robert Grange, were told not to report to work anymore, but they would continue to get paid.  Later in February, the Settlement Agreement which had been signed on February 22, 2012, was presented to the union members and ratified.  At that point, these plaintiffs received a package in the mail from Sunoco that gave them the option to be laid off, or to volunteer for the Decommissioning Team Project.  Dunbar had heard that he could also volunteer for the MWF or for a terminal job.  He asked a person in human resources how to do that, and was told to write it on the bottom of the form.  He did that and on March 8, 2012, got a voicemail message from Mike Griffin, Sunoco's general foreman for the maintenance group, to call him back.  he did so, and Griffin asked if Dunbar wanted to work on the MWF in Philadelphia.  He said yes, and Griffin told me to report to work on the following Monday March 12.  Dunbar asked how long the assignment would be, and Griffin said probably a few months.  Dunbar understood from the Settlement Agreement that he was just

postponing getting his severance until that assignment was done.  Tab 71 (Dunbar Verified Statement) ¶2-3

20. On Monday, April 23, 2012, Sunoco announced that it had a tentative agreement to sell the Philadelphia Refinery.  Mr. Felker then asked John O'Toole, the Sunoco Human Resources Manager at the Philadelphia Refinery, what the effect of that announcement would be on the MWF workers, specifically asking if they would get severance and if they would be offered jobs.  Mr. O'Toole said he would get back to Mr. Felker.  He asked if Mr. Felker had email, and Mr. Felker said no, to send the answer to Steve Gaines, his foreman from Marcus Hook, and he would give it to Mr. Felker.  Mr. O'Toole sent an email response to Steven Gaines on April 26, who printed out the email and gave Mr. Felker a copy.  The email stated:

> Paul Felker from MH came to see me this morning and asked what would happen to the Marcus Hook Mobile Workforce employees given the announcement on Monday.
>
> Paul said he does not use email so can you please get back to him for me.  This issue was discussed with the MH union during effects bargaining.  They will be severed when PHL is either sold or idle.  Thanks.

Mr. Felker and Mr. Dunbar took that email to mean that the MWF employees would then get the severance benefits also, since they would have fulfilled their job assignment, and they would get what everybody else got.  Tab 70 Felker Verified Statement ¶4 and attached Exhibit A; Tab 71 Dunbar Verified Statement ¶4 and attached Exhibit B.

21. During the entire time of their temporary assignment to the Philadelphia Refinery from March, 2012 until September 7, 2012, the last day of their employment with Sunoco:

      a.   none of the plaintiffs was ever included into the Philadelphia Refinery seniority list[4];

---

4 Sunoco has denied this fact in Tab 2, response to Request for Admission 4, asserting that paragraph 12 of the Termination Agreement between Sunoco and Local 10-1 specifically gave the MWF members refinery seniority for the Philadelphia Refinery.  However, the Termination Agreement (Tab 15)

b.  none of the plaintiffs was ever covered by the pay scale in the Philadelphia Refinery collective bargaining agreement (Tab 2, Request for Admission 5);

c.  each of the plaintiffs continued to receive pay in accordance with their pay scale under the Settlement Agreement (Tab 2, Request for Admission 2A), from which local Marcus Hook, not Philadelphia, wage taxes were deducted by Sunoco (Complaint and Answer ¶12c);

d.  each of the plaintiffs always remained as a bargaining unit member of Local 10-901 (Tab 2, Request for Admission 2B);

e.  none of the plaintiffs was ever notified by Sunoco that his temporary assignment at the Philadelphia Refinery had been converted to a permanent assignment.[5] Tab 70 Felker Verified Statement ¶5; Tab 71 Dunbar Verified Statement ¶5.

f.  none of the plaintiffs who was eligible for retirement upon termination (Plaintiffs Schrader, Grange, Frank Gannon, Brant, Kelso, Rushton, Jennings, Vandergrift, and Dunbar) was permitted to retire under the more generous terms of the pension plan applicable to Philadelphia Refinery workers subject to the Philadelphia Refinery collective bargaining agreement, which contained the "Rule of 60", but instead had their retirement eligibility and benefits determined under the less generous retirement plan applicable to Marcus Hook Refinery workers. (Tab 2, Request for Admission 7); Tab 70 Felker Verified Statement ¶6; Tab 71 Dunbar

expressly stated that it was contingent on the closing of Sunoco's transaction with PES ("contingent upon the closing" para I, bates D-00636 and "effective as of the Philadelphia Closing" para XIV, bates D-00639). The closing occurred on September 8, 2012, so Sunoco's denial of this fact is not based in fact.
5 Defendant denied this fact in its response to Request for Admission 3. Tab 2. However, Defendant has never produced any evidence that any MWF employee was notified that his assignment had been changed from the temporary assignment explicitly described in the Settlement Agreement to a permanent assignment.

Verified Statement ¶6.

22. Local 10-901 had bargained with Sunoco during the effects bargaining for application of the Rule of 60 for its members so as to enhance their pension payouts upon termination of their Sunoco employment, but Sunoco was insistent that it would not budge because the cost of such a concession would have been approximately $16 million, not including the cost of the severance plan. Tab 7, bates D-00551-552. See also Tab 8, bates 00612 (citing cost of $15 million) Ultimately, Local 10-901 conceded on this issue, as evidenced by the absence of any such provision in the Settlement Agreement.

23. On June 26, 2012, Local 10-1 entered into a Memorandum of Understanding and Agreement with Philadelphia Energy Solutions LLC ("PES"). PES was "[a] new entity … created to own and operate the Sunoco Philadelphia Refinery complex…." The purpose of the Memorandum of Understanding was "to set forth the Company's and Union's Agreement concerning wages, benefits, and other terms and conditions of employment…" at the Philadelphia Refinery once PES would take over its operations. Defendant's Administrative Record Bates D-00621 – 635, at 00623.

24. The actual negotiation that resulted in the June 26, 2012 Memorandum of Understanding and Agreement occurred not long before that date in Pittsburg, PA. Phil Rinaldi, the CEO of PES, together with several other individuals representing various PES interests, met with James Savage, the president of Local 10-1. One of the people who attended the meeting at the invitation of PES was Elizabeth Bilotta of Sunoco. Tab 69 Savage Verified Statement ¶2.

25. During the meeting, Mr. Rinaldi essentially went down a checklist of items that he had prepared in advance, including those items in the existing collective bargaining agreement that Local 10-1 had with Sunoco that PES was willing to continue to honor, as well as certain

additional items.  One of the additional items was his statement:  "We will hire the MWF workers."  (or words substantially to that effect.)  This was a proposal that came exclusively from Mr. Rinaldi, not from Local 10-1.  Tab 69 Savage Verified Statement ¶3.

26. Neither Mr. Rinaldi, nor Ms. Bilotta, who was present the entire time, gave any indication that this offer would have any effect on the severance rights of the MWF workforce. Tab 69 Savage Verified Statement ¶3.

27. Even though Mr. Savage knew that Local 10-1 did not represent the MWF workers, he had no reason to reject this offer, because he was not being asked to give anything up, either for the workers he did represent or for the MWF employees.  He was generally aware of the severance benefit that Local 10-901 had negotiated for its members, including the MWF workforce, but he did not feel that he had to be concerned about it because neither Mr. Rinaldi, nor Ms. Bilotta, gave any indication that this offer would have any effect on the severance rights of the MWF workforce, which he knew he had no power to bargain away in any event.  Tab 69 Savage Verified Statement ¶3.

28. The Memorandum of Understanding contained the following provisions:

> The Company also agrees to hire maintenance employees from the Marcus Hook mobile workforce who have been working temporarily at the Philadelphia Refineries.  Bates D-00624.

> Any maintenance employees receiving the mobile workforce payment of Three Dollars ($3.00) an hour, including those former Marcus Hook Maintenance employees who accept employment at the Philadelphia Refinery, would cease to receive the mobile workforce payment….  Bates D-00633.

29. As part of a Refining Contribution Agreement dated as of July 2, 2012, Sunoco agreed with PES that PES would offer employment to union represented refinery employees, specifically including the "mobile workforce maintenance employees temporarily assigned to the Refinery from Sunoco's Marcus Hook Refinery", that Sunoco "will terminate its employment of

each Acquired Employee effective as of the date preceding each such Acquired Employee's Employment Date", and that Sunoco "will not employ or provide severance payments to any Refinery Employee to whom [PES] makes an offer of employment who does not accept the offer." Defendant's Administrative Record bates D-00864-865.

30. Sometime in the Summer of 2012, the MWF members learned that PES had offered in negotiations with Local 10-1 to hire the MWF workforce along with the Philadelphia workforce. Tab 70 Felker Verified Statement ¶7; Tab 71 Dunbar Verified Statement ¶7.

31. Local 10-1 did not represent the MWF employees, and did not consult with any of the MWF employees concerning this negotiation. Tab 70 Felker Verified Statement ¶7; Tab 71 Dunbar Verified Statement ¶7.

32. After Mr. Felker learned about this offer, he went to David Campbell, the maintenance general foreman at the Philadelphia Refinery, and asked him if the MWF workers were still going to get severance. That resulted in a meeting on August 6, 2012, of the MWF workforce with John O'Toole, William Capresecco, who was in corporate human resources and was senior to Mr. O'Toole, Marla Gaskill, a human resources person who reported to Mr. O'Toole, Jim Demes, maintenance superintendent in charge of all northeast refineries for Sunoco, Bradley Galante, a maintenance superintendent who was under Demes, and David Campbell, the maintenance general foreman under Mr. Galante. At that meeting, the MWF employees told the Sunoco managers the reasons why they should get severance, all of which are the same or similar reasons to those that have been presented in their claims and in this litigation. They were not given an answer at that meeting. A few days later, they received an email from John O'Toole dated August 8, 2012, informing them that they were not going to get the severance benefit after they were terminated by Sunoco. The email read:

15

I want to follow up on our meeting on August 6, 2012.

When I responded to Paul Felker's question in April of 2012 which was what would happen to the MWF from Marcus Hook in the event of a sale or idling of PHL.  At that time there was no agreement between Sunoco and the USW to retain them on a permanent basis.  Given no agreement they were subject to being laid off.

Subsequently to that email the USW negotiated with PES to hire the Marcus Hook Mobile Workforce.  Since they are being retained they are not being laid off and therefore two weeks' notice of termination is not necessary.  They are not being laid off and not entitled to any severance.

Tab 70 Felker Verified Statement ¶7 and attached Exhibit B; Tab 71 Dunbar Verified Statement ¶7 and attached Exhibit C.

33. When the MWF employees began their employment with PES, they received a lower hourly wage than they had received while working for Sunoco.  Memorandum of Understanding para P, bates D-00633.

34. Basically, the MWF employees were being told that their only choices were to accept the job with PES (which was at a reduced pay rate from what they were being paid by Sunoco, and less generous benefits), or do not accept it and receive no severance. Tab 70 Felker Verified Statement ¶7 and attached Exhibit B; Tab 71 Dunbar Verified Statement ¶7 and attached Exhibit C.

35. The MWF employees were never represented by Local 10-1, the local that represented the Philadelphia Refinery employees.  Tab 69 Savage Verified Statement ¶3.

36. The MWF employees never authorized Local 10-1 to bargain away any rights that their union, Local 10-901, had secured for them in the Settlement Agreement. Moreover, because they were not members of Local 10-1, they were not even permitted to vote on the agreement with PES. Tab 70 Felker Verified Statement ¶9; Tab 71 Dunbar Verified Statement ¶9.

37. Upon the sale by Sunoco of the Philadelphia Refinery, the individual plaintiffs'

16

temporary assignment to the Philadelphia Refinery ended, and their employment with Sunoco was involuntarily terminated effective September 7, 2012, because there were no positions available for them to return to at the Marcus Hook Refinery due to the idling of the main processing units at that facility. [6]

38. Sunoco has stipulated that whether there were any positions available at Marcus Hook between July 2 and September 8, 2012, and who would or could have been considered for those positions, were not facts considered by the Plan Administrator in his decisions on the claim or appeal. Tab 3, page 2, para c.

39. On September 10, 2012, Elizabeth Bilotta on behalf of Sunoco signed off on a Termination Agreement with Local 10-1. Tab 15, bates D-00636-640 (Bilotta's signature on 9/10/12 is found on Bates 00640).

40. In the Termination Agreement (Tab 15), it was agreed that:

> For Marcus Hook Mobile Work Force employees who have been working **temporarily** at the Philadelphia Refinery ("MWF Employees") pursuant to the Settlement Agreement between Sunoco … and … Local 10-901 executed on February 22, 2012 ("MH Settlement Agreement") the Company and the Union agree that refinery seniority for the Philadelphia Refinery for all MWF Employees will be the first day any MWF Employees worked at the Philadelphia Refinery under the MH Settlement Agreement and in the order of their Marcus Hook seniority.

(Sec XII. Bates 00639) (emphasis added).

---

6 In its response to Request for Admission 9 (Tab 2), Sunoco denied that plaintiffs were "involuntarily terminated" although it does at least admit that their employment with Sunoco was "terminated". The difference, according to the response, is due to the fact that "plaintiffs' **bargaining agent** negotiated for their permanent transfer to PES commencing immediately after their termination of employment from Sunoco. Furthermore, the terms of the Memorandum of Understanding describe this permanent transfer as a 'conclusion of employment' which constituted 'continuous service' with PES." (emphasis added) The response is completely disingenuous. The bargaining in question was between Sunoco and Local 10-1, which defendant has acknowledged never represented the MWF employees. The Memorandum of Understanding was between PES and Local 10-1. The language "conclusion of employment" is found only in paragraph F(3) in describing that the rights of the former Sunoco employees with respect to their participation in the Sunoco retirement plans would be governed by the terms of those plans, not by PES. Defendant's Administrative Record Bates D-00627. The phrase "continuous service" was used only in paragraph L in the context of the waiting period to be eligible to participate in PES' short term disability plan. Defendant's Administrative Record, bates D-00632.

17

41. There is no language in the Plan that disqualifies an employee from severance benefits upon termination by Sunoco if the employee immediately obtains other employment, except in the instance of "employees who are working at the Marcus Hook Refinery at the time it is sold to a company not in the Sunoco organization and who are offered a position with the purchaser with comparable base salary or wages." Defendant's Administrative Record bates D-00031. The Plan also provides that "If the Marcus Hook Refinery is sold to a company not in the Sunoco organization, and an employee who is receiving severance benefits under this Plan is subsequently hired by the purchaser in a position with comparable base wages…, all severance payments will stop at hire." Defendant's Administrative Record bates D-00034.

42. By letter dated October 3, 2012, the Union's counsel wrote to Elizabeth Bilotta, the VP, Labor and Employee Relations at Sunoco (VB dep 44), asserting plaintiffs' right to the severance benefits, which they had not received. Defendant's Administrative Record bates D-00025-26.

43. Ms. Bilotta had led the negotiation team on behalf of Sunoco at the Effects Bargaining. VB dep. 44.

44. The letter of October 3, 2012 was not presented by Ms. Bilotta or anyone else at Sunoco to Mr. Brigandi, even though he was the person at Sunoco designated to resolve claims.   VB dep 44-45

45. The claim was rejected by Sunoco in a letter dated October 12, 2012, authored by Daniel V. Johns, Esq., of Ballard Spahr. Defendant's Administrative Record bates D-00027-28.

46. Mr. Johns was listed as a member of Sunoco's management negotiating committee in the Meeting Notes dated February 22, 2012, and served as one of Sunoco's outside labor lawyers in the negotiations. Tab 10 bates D-00617.

47. Brigandi did not participate in any way or have any input into this letter. He first saw the

October 3 letter to Bilotta and the October 12 response from Johns when he received the October 22 claim letter described in the next paragraph.  VB dep 46.

48. On October 22, the Union's counsel submitted on behalf of plaintiffs a formal written claim for benefits addressed to the "Plan Administrator, Sunoco, Inc." as set forth in the Plan. Defendant's Administrative Record bates D-00001-7. (The exhibits to this letter may be found at Tab 16, bates D-01040-1046.)

49. The letter came to Mr. Brigandi.  VB dep. 47.

50. Brigandi's first action was to forward the claim to Nan McCall, an in house Sunoco labor attorney on Ms. Bilotta's team who assisted with the Marcus Hook negotiations, Mr. Johns of Ballard Spahr, Samantha McMillan, another attorney at Ballard Spahr, Liz Bilotta, and Yeechun Su, an internal Sunoco labor attorney.  VB dep 48-49; Tab 16 bates D-01034.

51. His next step was to discuss the claim with attorney McMillan.  VB dep 51-56.

52. Brigandi has no notes of those conversations; indeed Brigandi has no notes of any conversations with anybody at any time regarding either the claim or the appeal.  VB dep 56.

53. Before the conversation between Brigandi and McMillan occurred, Ms. McMillan had a discussion with Ms. McCall ("Nan"), the in house Sunoco attorney who was part of the negotiating team, who appears to have told her that the "Severance plan was designed to give them severance if there was no more work at Philly."  Tab 17, Bates D-01047 handwritten notes.[7]

54. A meeting was held with Mr. Brigandi, Ms. McMillan and Ms. Bilotta on Nov. 29, 2012. Tab 20, bates D-01049.

---

7 Defendant has stipulated that the handwritten notes that appear on Bates pp. D-1047, 1048-49, 1061, 1062-63, 1065, 1066-68, 1073, and 1076-77 were notes made by Ms. McMillan during her employment with Ballard.  Tab 4.

55. There are no documents which show that Brigandi did anything to prepare for that meeting.

56. Ms. McMillan made notes to prepare for that meeting.  Tab 19, bates D-01048.

57. The only record of what was discussed at that meeting are Ms. McMillan's notes. Tab 20, bates D-01049.  The notes state in relevant part:

> 10-1 represents them now **as of Sept. 8th**.
>
> Carlyle [the majority owner of PES] agreed to treat them as other Philly union employees **b/c it was cheaper to hire existing employees**
>
> People in claim were chosen for MWF in 2009
>
> Expression of interest – MWF had the opportunity to get severance

(emphasis added)

58. Mr. Brigandi's recollection of this meeting is described at VB 57-66.  He described it as a fact finding meeting (VB 57).  He acknowledged, as stated in McMillan's notes, that he knew at the time he decided the claim and the appeal that the MWF workers were represented by Local 10-901 up through September 7, 2012. VB 64.  He testified that the "expression of interest" line in the notes referred to the fact that the MWF employees had the opportunity to get severance on February 29, 2012, the date of the idling of the Marcus Hook Refinery.  VB 64-66.

59. There is no evidence of any activity regarding the claim after November 29, 2012, until January 4, 2013, when Ms. McMillan sent to Mr. Brigandi, with copies to Mr. Johns and another attorney at Ballard, Brian Pinheiro (who was McMillan's manager), a draft of a letter she had prepared to Martin Milz denying the claim.  Tab 22, D-01179-82; VB 68.

60. Mr. Brigandi testified as follows about this letter:

> To the best of my recollection, I would not have participated in the initial draft.  I would have given Samantha guidance.  I would have told Samantha what I wanted the letter to reflect so that my decision was included in her draft.

VB 69. Mr. Brigandi claimed that occurred in "various meetings and telephone calls prior to this January 4th date" (VB 69), but when asked if he could identify any record of any such communications, he was unable to do so. VB 69-72. Nevertheless, he testified that he specifically recalled either a phone call (most likely) or a face to face meeting prior to January 4 in which he told her that "the claim should be denied, and it was because the employees were not terminated as a result of the Marcus Hook idling [and for no other reason]." VB 72-74.

61. When asked what investigation he had done to that point to make that decision, he said that he held meetings with Ms. Bilotta and Ms. McMillan and pulled various documents for review. Specifically, he said that he:

> Would have met with Liz **because I needed to understand the intent of the negotiations** since she was the lead negotiator on behalf of the company. **I would have asked her to provide any documents that would have supported the intent.** And I would have also met with Nan McCall … because Nan was the attorney that supported – the internal attorney that supported Liz on the negotiations.

VB 75-76 (emphasis added).

62.     Mr. Brigandi also testified as follows:

> Q. Did you inquire of anyone in the course of your investigation to determine what either the union or the Mobile Work Force employees had been told back in February about their eligibility for severance if they accepted the assignment at the Philadelphia Refinery?
> A. I did.
> Q. And what did you find out about that?
> A. I found out that they were offered the opportunity to take severance in February if they did not want to take on the Mobile Work Force role. If they took the assignment and if we were successful in closing a deal with a buyer, because it was unclear at the time, and if they got work with the new company, like everyone else, they would not be eligible for severance. However, if the buyer did not hire them as part of the agreement, they would be eligible for severance at the time their employment ended.
> Q. And who told you that?
> A. That would have been Liz and – Liz is who I recall.
> Q. And did she tell you that that's what they were informed back in February when they had the choice?
> A. To the best of my memory, that's correct, yes.

21

Q. And you relied upon that information, right?

A. I did.

VB 176-177.

63. When asked if he knew that Ms. Bilotta was also involved with the negotiations with Local 10-1 regarding the Philadelphia refinery in the summer of 2012, he said that he did, but he only asked her about the intent of the Marcus Hook negotiations, not the Philadelphia negotiations. VB 76-77.

64. The meetings with Ms. Bilotta and Ms. McCall all occurred in the presence of Ms. McMillan. Mr. Brigandi did not keep notes of those meetings or records of the documents produced; that was Ms. McMillan's job, and Ms. McMillan kept whatever documents were provided. VB 77-78.

65. When asked whether McMillan would have notes of the meetings or telephone calls with Bilotta and/or McCall that he claimed occurred before January 4, he said yes. VB 79.

66. However, no such notes, other than the note for the meeting on November 29, have been produced. VB 79-80.[8]

67. According to Ms. McMillan's email of January 4 transmitting the draft reply, **her** plan was to get Mr. Brigandi's comments and Mr. Johns' comments on the draft first, then send it to Bilotta and "Rob" (Robert Kerrigan, Mr. Brigandi's boss, VB 85), for their thoughts. Tab 22, Bates D-01179.

68. Mr. Brigandi recalled that he spoke to Ms. McMillan after getting this letter because he did not understand some of the language. VB 86.

69. Ms. McMillan advised Mr. Brigandi on the morning of January 7 that Mr. Johns had no

---

8 Defendant has represented in discovery that it has produced all responsive handwritten or electronic notes. Tab 3, page 2, para 3.

comments or changes.  Tab 23, bates D-01174.

70. That afternoon, Mr. Brigandi responded with a redline edit that made only a few very minor, nonsubstantive changes.  Tab 24, bates D-01170-73.

71. He also suggested that the draft be sent to Yeechun Su as well as Mr. Kerrigan for their comment. Tab 24, bates D-01170.

72. To Mr. Brigandi's knowledge, Ms. Su was not an ERISA specialist, but rather a Sunoco in house labor lawyer.  VB 95-96.

73. Part of the reason he wanted Ms. Su to review the draft was because she "also had an understanding of the negotiations, so I wanted to make sure she was involved so that the facts were accurate."  VB 89.

74. Ms. McMillan then sent the draft to Ms. Su and Mr. Kerrigan for their comments.  Tab 25, D-01154.

75. Mr. Kerrigan responded:  "I assume also PES assumed the CBA as successor?  That should be pointed out as a de facto indication that employment continued…."  Tab 26, bates D-01190.

76. Ms. McMillan responded:  "I believe PES assumed the Philadelphia Union CBA, not the Marcus Hook Union CBA.  **The members of the Mobile Work Force were considered Marcus Hook union employees until the closing date.  They became part of the Philadelphia union on September 8, 2012.**" Tab 28, bates D-01191 (emphasis added).  These facts were known to Mr. Brigandi and were part of his decision making process.  VB 92.

77. On January 9, Ms. Su circulated her substantive comments to the draft letter.  Tab 31, bates D-01183-88.

78. From this document (Tab 31, bates D-01183, 86-88), it is apparent that it was Ms. Su

who came up with the idea that the MWF employees' assignment to Philadelphia changed from "temporary" to "permanent" after PES agreed to hire the MWF employees and Sunoco "committed to PES in the July 2, 2012, Contribution Agreement that we would not take any action to prevent these individuals from becoming PES employees at Close…." She also crafted the argument that PES is an affiliate of Sunoco, so that "we should not be referencing the deal with PES as a sale of the Refinery to PES." She raised the argument that the MWF employees are not entitled to severance because Sunoco never gave them two weeks' notice of layoff. Finally, she corrected a fact that Ms. McMillan had wrong: PES did not even assume the Philadelphia collective bargaining agreement. It negotiated an entirely new agreement with Local 10-1.

79. The next activity was a meeting on January 21 to finalize the letter. The attendees were to be Ms. McMillan and Mr. Pinheiro from Ballard, and Mr. Kerrigan, Ms. Su and Ms. Bilotta from Sunoco, as well as Mr. Brigandi. Tab 34, bates D-01199.

80. Ms. Bilotta was invited, according to Mr. Brigandi, because:

> Her input was more around if anything around the agreement, the contribution agreement that might have been in the letter, was accurately reflected as well, and any other facts surrounding the negotiation.

VB 95.

81. Following that meeting on January 21, Mr. Brigandi sent an email to all attendees in which he accepted all of Ms. Su's edits from January 9, made some relatively minor and nonsubstantive edits that had been discussed at the meeting, and asked for everyone to sign off on the final draft. Tab 35, bates D-01150; VB 96-97.

82. After a few additional edits from Ms. Su (Tab 37, bates D-01055-58 and Tab 41, bates D-01136-40), and from the Ballard attorneys (Tab 38, bates D-01146-49), and from Mr. Kerrigan

24

(Tab 42, bates D-01211-13), Mr. Brigandi sent the final letter on January 22, 2013.  Tab 43, bates D-01132-35.  See also VB 96-100.

83. The final letter (Defendant's Administrative Record, bates D-00008-10) contains Ms. Su's argument that Sunoco's assignment of the MWF employees to Philadelphia changed from temporary to permanent after PES agreed to offer employment to those employees.  When asked whether he had any personal knowledge as to whether this was factually accurate, Brigandi stated that he did not.  VB 105.  When asked on what information he based this conclusion, he stated that it was based on the documents he read.  VB 106.  It is obvious from the documentary evidence, however, that this was not his conclusion at all, but rather was an argument crafted by Ms. Su.

84. Although he affirmatively reached out to Sunoco representatives involved in the effects bargaining to gather facts upon which he based his decision, at no point did Mr. Brigandi reach out or attempt to communicate with any union representatives to gather any facts. VB 106-107.

85. The letter of January 22, 2013 contains a number of assertions with respect to Sunoco's "intentions."  One, in particular, is the last sentence in the second full paragraph on the second page of the letter, which reads:  "As set forth in the Plan, it was never the intention of Sunoco to provide severance benefits under the Plan to employees who were not terminated in connection with the idling of such refinery."  Mr. Brigandi testified that this came in part from Ms. Bilotta, "because Liz was the person who would explain to me the intentions of the discussions, and quite possible Nan as well."  VB 109-110.

86. Mr. Brigandi understood that the Plan was something that was agreed to in negotiations with Local 10-901.  However, even though he made inquiry of Ms. Bilotta as to the intentions of Sunoco, he made no inquiries of the union to find out what its intentions were. He relied simply

on Sunoco's intentions, not the mutual intent of the parties. VB 110.

87. On March 13, 2013, the Union submitted on behalf of plaintiffs a written request for review to Mr. Brigandi. Defendant's Administrative Record bates D-00011-13 (without attachments).  The entire submission (letter and attachments) is found at Tab 73, bates P-00157-202.

88. Brigandi said that when he read the appeal, he did not see anything to cause him to change his mind, but would still go through the process of getting people together to see if there was anything that they had missed.  VB 117.

89. Upon his receipt of the appeal letter on March 18, Brigandi circulated the letter to Bilotta, Su, Kerrigan, McMillan, and Kerrigan's boss, Chris Curia.  Bilotta in turn circulated it to McCall and Johns.  Tab 44, bates D-01214, VB 112-115.

90. With the exception of Mr. Curia, these are the same people who were involved in the original claim.

91. There is no record of any activity with respect to this appeal until a notation on April 17, almost a month later, of an appointment of Brigandi with McMillan to be held on April 26.  Tab 45, bates D-01218, VB 116.

92. Before that meeting, McMillan sought to meet with Dan Johns to get his thoughts on the appeal letter.  Tab 46, bates D-01131.

93. Tab 48, bates D-01059-64 contains a copy of Mr. Brigandi's January 22 letter, and the union's March 13 appeal letter, with various handwritten notes and initial comments by Ms. McMillan.

94. A meeting occurred between Brigandi and McMillan on April 26.  VB 120-21.

95. By April 26, Mr. Brigandi claims he had already made his decision.  VB 121.

96. Ms. McMillan's notes of that meeting are at Tab 49, bates D-01065.

97. Mr. Brigandi is unable to tell what in those notes represented his thoughts, and what represented Ms. McMillan's. VB 123-24. But those notes presumably reflect what they discussed.  Significantly, that included:

- The MWF employees were "Not in the Phila union"

- The MWF employees "were terminated"

- The "Phila union recognized that the term. of employment was not a severable event – they did not raise issue in effects bargaining

The way the notes are written, it looks like either Ms. McMillan, or Ms. McMillan and Mr.

Brigandi together, decided that there would be four reasons for denying the appeal:

1. Not terminated in connection w/idling
2. Exclusion only applies if you are eligible
3. Became permanent Phila ees on July 2nd b/c we could not term or transfer – we did not have to do this – if we didn't they would have been sent back to MH, severance and no job
4. No distinction between MH and Philly employment – always a Sunoco ee until Sept. 7th.

98. McMillan then prepared the first draft of the response.  VB 127-28; tab 51, bates D-01066-68.

99. On April 30, there was a meeting with Ms. McMillan, Mr. Brigandi and Rob Kerrigan. Tab 50, bates D-01226.  Mr. Brigandi testified that at that meeting he reviewed the draft with Ms. McMillan and Rob Kerrigan, who was acting as both "legal advisor to the plan" and vice president of human resources and administration, which included many duties unrelated to the role of plan fiduciary.  VB 128-30.

100.        This testimony is consistent with Ms. McMillan's handwritten notes on the draft at Tab 51, bates D-01066-68.  The words "Meeting w/Vince and Rob" at the top of bates D-01066 suggests that this typewritten draft was present at the meeting, and Ms. McMillan made

notes on the draft during the meeting.  Some of the significant notes include:

- "We followed the CBA that was in effect"  Bates D-01066

- The typed language in the middle of the second paragraph on bates D-01066 which read "although the members of the MWF were terminated from employment with Sunoco on September 7, 2012…" was crossed out, and a note appears on the bottom reading "the MWF were to be assigned/transferred to PES"

- On the next page (D-01067), in the third line the word "terminated" is crossed out, and there is a marginal handwritten note that says:  "transferred employment not terminated."

101.      The concept of "transfer" rather than "termination" came from Rob Kerrigan.  See McMillan's handwritten note at Tab 62, bates D-01073 as follows, which was directed to Mr. Pinheiro for his comments[9]:  "If you have time this morning, can you take a look at this letter?  If not, I will just send to Rob and Vince.  Rob wants to get away from the termination concept but rather that we transferred MWF ees to PES (which is a somewhat different approach than the 1/22 letter)."  See also VB 145-146.

102.      While the document at Tab 62 is not dated, McMillan's handwritten note to Pinheiro, and the typed text which incorporated the handwritten notes McMillan had made at the April 30 meeting with Brigandi and Kerrigan, specifically including the "transfer" rather than "termination" language (see the first line on bates D-01074), suggests the document was created by McMillan and McMillan's handwritten notes added on or shortly after April 30.

103.      When asked whether the "transfer" rather than "termination" concept  was

---

9 Defendant has stipulated that the note on the top of bates D-01073 was directed by Ms. McMillan to Mr. Pinheiro.  Tab 4.

significant, Brigandi said:

> Depending on how we came out, it would have bolstered our argument if there was indeed a transfer.  It would have added another fact to help with the argument.

VB 146-47.

104.    Mr. Brigandi testified that he adopted that argument, VB 149-150, and the final letter rejecting the appeal included language that the employees were "transferred from Sunoco employment to PES employment."  Tab 67, bates D-01071.

105.    While the document at Tab 62 is not dated, as noted above it was created following the April 30 meeting. It must also have been created before May 7 (the next dated document), because McMillan's email and revised draft of May 7 (Tab 52, bates D-01123-30), incorporates the handwritten edits Pinheiro made to it.  Tab 62, bates D-01074.  This shows that between April 30 and May 7, it was Mr. Pinheiro who came up with the idea that the fact that the MWF employees remained subject to the Marcus Hook collective bargaining agreement "is irrelevant as to whether they were permanently assigned to the Philadelphia Refinery."[10]

106.    That precise language was included by Ms. McMillan in the draft she circulated on May 7, Tab 52, at bates D-01125, to Brigandi and Kerrigan for comment, with a copy to Pinheiro.  Tab 52, bates D-01123-30; VB 131-32.

107.    Brigandi then solicited Su's and Bilotta's comments.  VB 132; tab 53, bates D-01227-35.

108.    Mr. Kerrigan and Mr. Brigandi each made some minor stylistic edits (Tab 54; bates D01119-22 (Kerrigan); Tab 55, bates D-01115-18 (Brigandi)), and Mr. Brigandi sent the draft back to Ms. McMillan.  Tab 55, bates D-01115.

---

10 Defendant has stipulated that the handwritten notes on bates D-01074 were Mr. Pinheiro's.  Tab 4.

29

109.    Yeechun Su then submitted an edit with significant comments.  She was continuing to refine the "permanently assigned" argument she had crafted in response to the initial claim, and on the issues of comparable wages and benefits.  Tab 56, bates D-01110-14.

110.    Ms. McMillan then incorporated all of these edits into one document for recirculation and review.  Tab 57, bates D-01100-09.  VB 132-135.

111.    There were then exchanges with Mr. Kerrigan and Ms. Su involving the contribution agreement between Sunoco and PES, which Mr. Brigandi testified was pertinent to the decision because it was relevant to the issue of permanent transfer.  VB 136-138; Tab 58, bates D-01097; Tab 60, bates D-01079.

112.    On May 16, 2013, just before the letter denying the appeal was going to be sent out, Brigandi sent an email to Chris Curia (the Vice President of Human Resources and Kerrigan's boss VB 114) which reads:

> Liz suggested I include Tim Conway, VP Admin on the reply to the union.  He is the one who negotiated the deal with PES to keep the MWF employees.  She felt he was instrumental in negotiating the whole deal **and would be an advocate in helping us fend off the appeal.**

Tab 65, bates D-01250 (emphasis added).

113.    Brigandi testified that Conway was an officer of the United Steelworkers International Union.  VB 141.

114.    On May 16, 2013, Brigandi sent the letter that denied the appeal.  Tab 67, bates D-01069-72.  Conway was copied on the letter denying the appeal.  Tab 67, bates D-01072.

115.    In the past (that is, before the events of 2012 involving the MWF), if an individual who worked in Marcus Hook and was a member of Local 10-901 was permanently assigned to the Philadelphia Refinery, he became governed by the Local 10-1 collective bargaining agreement, and his benefits became governed by the Local 10-1 agreement as well. VB 166-68.

116.    Similarly, Brigandi was not aware of any situation before the events of 2012 involving the MWF where an individual who was subject to the Marcus Hook collective bargaining agreement was permanently transferred to the Philadelphia Refinery, but remained subject to the Marcus Hook collective bargaining agreement.  VB 168-170.

117.    Mr. Brigandi testified that, to the best of his recollection, the termination agreement between Sunoco and Local 10-1 (Tab 15, bates 00636-640) was not among the documents he reviewed.  VB 173-74.

118.    When Brigandi had met with Bilotta and asked her "for documents that would have been helpful in understanding what the intent of the severance agreement was," VB 175, she did not then or thereafter give him the Termination Agreement between Sunoco and Local 10-1, VB 175, or any of the bargaining meeting minutes.  VB 176.

119.    Brigandi "was not personally represented in his capacity as the individual to whom Sunoco had delegated discretionary authority to administer the Plan."  Tab 1, Answer to Interrogatory 4.  Therefore it must be concluded that the Ballard attorneys were representing Sunoco.

120.    Had Brigandi chosen to do so, there was a process by which he could have sought approval to consult with lawyers other than those at Ballard to advise him with respect to the claim and appeal of the MWF employees, but he did not do that in this case.  VB 191-193.

121.    Plaintiffs have fully and timely exhausted all of their administrative remedies. Complaint and Answer ¶20.

Date: September 29, 2015                    Respectfully submitted,


                                            / s/ Ronald H. Surkin
                                            Ronald H. Surkin
                                            Schoenfeld, Surkin,
                                            Chupein & DeMis, PC

31

25 West Second Street, PO Box 900
Media, PA  19063
610.565.4600
Fax 610-566-8257
rsurkin@sscd-law.com

Attorneys for Plaintiffs