IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PAUL L. FELKER, et al.,

           Plaintiffs,

   v.

USW LOCAL 10-901, USW LOCAL 10-901
(SU) AND USW LOCAL 10-901 (NE)
MARCUS HOOK REFINERY WORKERS
INVOLUNTARY TERMINATION PLAN,

           Defendant.

CIVIL ACTION
NO. 13-7101

**OPINION**

**Slomsky, J.**                                                   **June 8, 2016**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL AND PROCEDURAL SUMMARY .............................................. 2

III.    STANDARD OF REVIEW ......................................................................... 10

     A.    Summary Judgment ....................................................................... 10

     B.    ERISA Arbitrary and Capricious Standard ....................................... 11

IV.    ANALYSIS ................................................................................................ 12

     A.    Consideration of Evidence Beyond the Administrative Record ........... 12

     B.    The Plan Administrator's Conflict of Interest ..................................... 16

     C.    Review of the Plan Administrator's Decision ..................................... 27

V.     CONCLUSION .......................................................................................... 34

## I. INTRODUCTION

Plaintiffs are former employees of Sunoco, Inc. ("Sunoco") who claim they are owed benefits under a severance benefit plan established through negotiations with Sunoco. (Doc. No. 1 ¶¶ 1-3.) They bring this case under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. Defendant is an employee welfare benefit and severance plan subject to the requirements of ERISA. (Doc. No. 1 ¶ 3.)

Before the Court are the Motion for Summary Judgment of the numerous Plaintiffs[1] (Doc. No. 27) and the Motion for Summary Judgment of Defendant USW Local 10-901, USW Local 10-901 (SU) and USW Local 10-901 (NE) Marcus Hook Refinery Workers Involuntary Termination Plan (Doc. No. 29). Also before the Court are Defendant's Motion to Strike (Doc. No. 30), Defendant's Motion for Leave to File a Reply Memorandum of Law in Further Support of its Motion for Summary Judgment (Doc. No. 35), and Defendant's Motion for Leave to File a Reply in Further Support of Defendant's Motion to Strike (Doc. No. 38).

For reasons that follow, the Court concludes that Defendant's denial of benefits was neither arbitrary nor capricious and was warranted under ERISA, and therefore Defendant's Summary Judgment Motion (Doc. No. 29) will be granted and Plaintiffs' Motion (Doc. No. 27) will be denied. In addition, Defendant's Motion to Strike (Doc. No. 30) will be granted and Defendant's Motions for Leave to File Replies (Doc. Nos. 35, 38) will be denied.

---

[1] The Plaintiffs are: Paul L. Felker, William Schrader, Michael McCormick, Anthony M. Kozlowski, William T. Dunbar, Edward R. Maciejewski, Brian J. Kelso, William Vandergrift, Paul D. Jennings, Darryl T. Brant, Fred J. Sobotincic, Robert A. Forte, Jr., Andrew R. Goss, Edwin J. Eriksen, Anthony C. Reilly, Frank T. Gannon, John P. Gannon, Brian D. Barrowcliff, Leo Rushton, Deonarine Jawahir, Carl Holderer, Robert A. Grange, and Paul C. Miller.

## II. FACTUAL AND PROCEDURAL SUMMARY

During the relevant time period, Plaintiffs were employees of Sunoco, members of United Steel Workers Local 10-901 (the "Union"), and assigned to Sunoco's Marcus Hook Mobile Work Force (the "MWF"). (Doc. No. 1 ¶ 2.) The MWF consisted of maintenance workers employed at Sunoco's Marcus Hook Refinery who also worked at Sunoco's Philadelphia Refinery. (Doc. No. 13 at 3.)

Sunoco's severance benefit plan (the "Plan") was established pursuant to a Settlement Agreement between Sunoco and Plaintiffs' Union, and became effective on or about February 22, 2012. (Administrative Record ("R.") at D-43.) The Settlement Agreement was precipitated by the pending closure of the Marcus Hook Refinery. It states, in relevant part:

**1. Purpose**:

Sunoco, Inc. (R&M) (hereinafter referred to as the "Company") has advised United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC and its Local 10-901, 10-901 (SU), and 10-901(NE) (hereinafter collectively referred to as the "Union") that it plans to idle the main processing units at the Marcus Hook Refinery (the "Refinery") and run a terminal operation (the "Terminal") effective March 1, 2012. Additionally, the Company plans to run limited process areas including Pilot Plant (Race Fuels), 15-2 Splitters, and associated processes required to run the 15-2 Splitters. Collectively, the Terminal and identified process areas shall be referred to in this Agreement as the "Terminal Facility." The Union has been advised by the Company that it plans to begin layoffs effective February 29, 2012 and transition to the terminal operation (Marcus Hook Terminal Facility) in phases that will be completed no later than December 1, 2012. In light of those circumstances, this Settlement Agreement is intended to set forth the complete understanding of the parties with respect to the rights and obligations of Union represented employees employed at the Refinery (hereinafter "Employees") as a result of the changed operation.

**2. Effects Bargaining:**

The Union agrees, and acknowledges, that it has had a full opportunity to bargain, and has bargained, over the effects of the Company's decision to idle the main processing units at the Marcus Hook Refinery and to transition to a Terminal Operation on the site.

(R. at D-44-45.)

The Settlement Agreement provides the following with regard to MWF employees:

**14. Mobile Work Force:**

Bargaining Unit employees who are currently classified as Mobile Work Force (MWF) employees who are not retained to work at the Marcus Hook Terminal Facility will be afforded the opportunity to be assigned on a temporary basis to work at the Philadelphia Refinery and work until laid off from such temporary assignment as determined by management. Employees will be given two week's [sic] notice of layoff date. Such employees will be eligible to receive enhanced Severance Benefits at the time of such layoff.

(R. at D-51.)

Prior to establishment of Sunoco's severance benefit plan, the main processing units at the Marcus Hook Refinery were idled. (Doc. No. 1-1 at 3.) According to a section of the Plan entitled "Background and Purpose of the Plan," the Plan "is intended to alleviate financial hardships which may be experienced by employees of [Sunoco] whose employment is terminated in connection with [Sunoco's] idling of the main processing units at its Marcus Hook Refinery." (R. at D-30.) Benefits awarded under the Plan are paid out of Sunoco's assets. (Doc. No. 1-1 at 11.)

The Plan states that it will be administered as follows:

**Plan Administration**

The Plan Administrator or his delegate has full responsibility for interpreting and administering the terms and provisions of the Plan. All interpretations, determinations and decisions of the Plan Administrator (or its delegate) in respect to any [matter] shall be final, conclusive and binding upon the Company, any employer, participants and all other persons claiming an interest in the Plan. . . .

(R. at D-38.) The Plan also contains the following relevant provisions:

**II. Guidelines for Determining Eligibility for Severance Benefits**

This Plan only applies to those employees whose employment is terminated in connection with the Company's idling of the main processing units at the Refinery and transition to a terminal operation at the Refinery.
. . .

The Presence of any of the following criteria will render an employee ineligible for severance benefits under the Plan, and management does not have the discretion to grant severance benefits under the Plan if any of the following criteria are present. Accordingly, severance benefits will <u>not</u> be applied to:
. . .

Employees who refuse to accept, whether with Sunoco or any of its affiliate companies, assignment to an equivalent position or a change in work location, provided that, for non-exempt employees, a change in work location does not increase the commute from their current residence to their new work location by at least 35 miles. An equivalent position is any position one salary grade lower, or of the same or higher salary grade, than the employee's present position. (This paragraph does not apply to employees who are part of the Mobile Work Force, as designated by the Company in its sole discretion, and who are transferred to a position at the Company's Philadelphia Refinery for a limited period time.), or

Employees who are eligible to receive benefits under any other severance plan of the Company.

Severance benefits also will not be paid to employees who are working at the Marcus Hook Refinery at the time it is sold to a company not in the Sunoco organization and who are offered a position with the purchaser with comparable base salary or wages. Base wages of a new position are comparable to Sunoco base wages only if the base wages of the new position equal at least 80 percent of base wages received by Sunoco prior to termination. Only base wages will be evaluated when determining eligibility for severance benefits. The value of Sunoco's benefit program and the new employer's benefit programs will not be considered when determining eligibility for severance benefits. All determinations of comparability will be made by the Plan Administrator.
. . .

If the Marcus Hook Refinery is sold to a company not in the Sunoco organization, and an employee who is receiving severance benefits under this Plan is subsequently hired by the purchaser in a position with comparable base wages (80 [percent] or more of base wages received at Sunoco prior to termination), all severance payments will stop at hire.

(R. at D-31, D-34.)

The Plan states: "The provision of severance benefits under the Plan is pursuant to a negotiated Settlement Agreement entered into between the Company and the Union as a result of Effects Bargaining Negotiations dated February 29, 2012." (R. at D-30.) It further states, "This document serves as both the official plan document and the summary plan description. The terms of the Plan control over any other Company policies or any other supporting documentation." (R. at D-38.)

Sunoco designated its Chief Executive Officer ("CEO") to make decisions regarding the Plan. This designation was made in a resolution of the Board of Directors of Sunoco, dated November 4, 1993. (Doc. No. 19-1, Ex. A.) On March 1, 2012, pursuant to the authority delegated to him in the November 4, 1993 Board Resolution, the CEO of Sunoco executed an Officer's Certificate appointing Vincent J. Brigandi as Plan Administrator of the Plan. (Doc. No. 19-1, Ex. B.) The Officer's Certificate provides that "the Plan Administrator may take all actions necessary to effectuate the intent of this Officer's Certificate." (Id.)

The Plan Administrator, Vincent J. Brigandi, was the Senior Director of Benefits and Plan Administration at Sunoco. (Pls. Ex. 72 at 11.) His duties in 2012 and 2013 included administration of Sunoco's health and welfare plans, management and negotiation of contracts with health and welfare vendors, administration of Sunoco's 401k plan, and the administration of Sunoco's defined benefit pension plans. (Pls. Ex. 72 at 14.) The Plan Administrator adjudicated claim decisions as well as appeals of claim decisions. He knew that when he was adjudicating claims and appeals, he was acting in a fiduciary capacity and had a responsibility to act solely in the interest of the participants and beneficiaries. (Id. at 36.) As of June 2015, the Plan Administrator had "robust prior experience" administering at least 20 plans and adjudicating over 180 claims. (Id. at 12.)

A new entity called Philadelphia Energy Solutions LLC ("PES") was created in June 2012 to "own and operate the Sunoco Philadelphia Refinery complex." (R. at D-623.) On June 26, 2012, in anticipation of the formation of PES, a "Memorandum of Understanding and Agreement" ("MOU") was entered into by the Union and PES. The stated purpose of the MOU was to "set forth the Company's and Union's Agreement concerning wages, benefits, and other terms and conditions of employment needed for the Company to proceed." (R. at D-623.) The MOU states, in relevant part:

> The Company agrees to hire all active former USW represented employees currently employed by Sunoco at the Philadelphia Refineries. . . . The Company also agrees to hire maintenance employees from the Marcus Hook mobile workforce who have been working temporarily at the Philadelphia Refineries. These former Marcus Hook Maintenance employees will be paid at the same wages as other Philadelphia Refinery maintenance employees in accordance with Supplement No. 1 Maintenance Rate Schedule and will be given credit for their Marcus Hook service including combined time between Marcus Hook and the Philadelphia Refineries for benefit eligibility purposes, such as vacation eligibility. These former Marcus Hook Maintenance employees will be added to the bottom of the seniority list in the order of their Marcus Hook seniority date. Further, in the event of hiring during the term of this Collective Bargaining Agreement, the Company agrees to consider qualified former employees of Sunoco who have been permanently laid off from the Marcus Hook Refinery. Such consideration shall be based upon the former Sunoco employee having a solid record of performance.

(R. at D-624-25.)

On July 2, 2012, PES and Sunoco entered into a Refining Contribution Agreement (the "Contribution Agreement"). (R. at 858.) Pursuant to the Contribution Agreement, Sunoco agreed with PES that PES would offer employment to "all hourly represented mobile workforce maintenance employees temporarily assigned to the Refinery from Sunoco's Marcus Hook Refinery." (R. at D-864.) The Contribution Agreement further stated that offers of employment would be made "at a base salary or base wage which is at least equal to that provided by Sunoco

or its Contributing Subsidiaries immediately prior to the Closing Date (unless otherwise mutually agreed as to specific Refinery Employees)." (R. at D-864.)

In September 2012, Sunoco sold its Philadelphia Refinery to PES. (Doc. No. 12 at 3.) On September 7, 2012, Plaintiffs were terminated by Sunoco. (Doc. No. 1 ¶ 12.) That same day, Plaintiffs were hired by PES to work at the Philadelphia Refinery under the Contribution Agreement between Sunoco and PES. (Doc. No. 13 at 3.)

On October 3, 2012, Martin Milz, counsel for Plaintiffs' Union, wrote a letter to Elizabeth Bilotta, Vice President of Labor and Employee Relations at Sunoco. (R. at D-25.) His letter stated, in relevant part:

> Please recall that this office represents USW Local 10-901. It has been brought to my attention that the members of the Marcus Hook Mobile Work Force ("MWF") who were sent to work in the Philadelphia refinery during the closure of the Marcus Hook facility have not been provided information regarding their severance benefits upon termination of their responsibilities to Sunoco Marcus Hook. Upon receiving news that these individuals would be hired by the new Carlisle Group venture in Philadelphia, I solicited Sunoco's position on the availability of severance or continuing pension credits through its counsel, Dan Johns. Mr. Johns informs me that he has received no response to his inquiries to the Company.

(R. at D-25.)

Daniel Johns, Sunoco's outside labor counsel, responded to the October 3 letter on October 12, 2012. The letter stated, in pertinent part:

> As an initial matter, these employees are not entitled to severance because they never lost their jobs. Indeed, as I am sure you know, these employees have been offered full time employment on an ongoing basis at the Philadelphia Refinery and did not experience any break in employment as the result of the idling of the main processing units at the Marcus Hook Refinery. . . . [T]he Marcus Hook effects [sic] settlement agreement clearly states that the Mobile Work Force employees are only entitled to severance after being given notice of a layoff. As these employees have not been laid off and have never been given such notice, they are not entitled to severance benefits pursuant to that agreement. . . . Accordingly, based on the relevant agreements and bargaining history between the parties on this issue, I see no basis for your assertion that it was the intent of

the parties to treat the Mobile Work Force employees better than every other group of USW employees from Marcus Hook or Philadelphia. Please give me a call if you would like to discuss these issues further.

(R. at D-27-28.)

On October 22, 2012, Plaintiffs filed a claim for severance benefits under the Plan. (Doc. No. 1 ¶ 16.) They contend that they were involuntarily terminated by Sunoco because Sunoco idled the main processing units at its Marcus Hook Refinery (Id. ¶ 12), even though they were immediately transferred to the Philadelphia Refinery as part of the Contribution Agreement between Sunoco and PES. Because of their termination from the Marcus Hook Refinery, Plaintiffs allege that they are due severance benefits under the terms of the Plan. (Id.)

Vincent Brigandi, as Plan Administrator, denied the claim. (Doc. No. 13-3, Exs. D, F.) In a letter dated January 22, 2013, the Plan Administrator explained his decision:

> Although the members of the MWF did terminate employment with Sunoco on September 7, 2012, such termination only occurred because of Sunoco's contribution of the assets of the Philadelphia Refinery to a joint venture with Philadelphia Energy Solutions (PES) for which PES is responsible for the operations of the Philadelphia Refinery. Members of the MWF were not terminated from employment in connection with the idling of the Marcus Hook Refinery and therefore, they are not entitled to severance benefits under the Plan.

(R. at D-8.) Thus, the Plan Administrator determined that Plaintiffs did not meet the eligibility criteria set forth in the severance plan because they were not terminated in connection with the idling of the Marcus Hook Refinery. The Plan Administrator explained, however, that even if Plaintiffs had satisfied that threshold requirement, they would still be ineligible for benefits because they did not "refuse to accept, whether with Sunoco or any of its affiliate companies, assignment to an equivalent position or a change in work location, provided that, for non-exempt employees, a change in work location does not increase the commute from their current residence to their new work location by at least 35 miles." (R. at D-9.) Although this provision

does not apply to employees who were "transferred to a position at the Company's Philadelphia Refinery for a limited period of time," the Plan Administrator noted that the employees' assignment became permanent upon the signing of the MOU. (R. at D-9.) The Plan Administrator stated that the employees "elected to continue their employment with Sunoco at the Philadelphia Refinery, which allowed them to receive the same benefits as employees in Local 10-1 when PES began operating the Philadelphia Refinery, including remaining employed at the Refinery after the closing date." (R. at D-10.)

On December 5, 2013, after exhausting their administrative remedies, Plaintiffs filed a Complaint in this Court seeking judicial review of the Plan Administrator's decision denying their request for benefits. (Doc. No. 1.) On March 17, 2014, Defendant filed an Answer to the Complaint. (Doc. No. 6.) On May 1, 2014, following a pretrial conference with counsel for parties, the Court ordered the parties to file briefs on the standard of review under ERISA and whether the Court should permit discovery outside the Administrative Record. (Doc. No. 10.) On June 20, 2014, after the parties had filed their briefs, the Court held a hearing. (Doc. No. 18.) On August 6, 2014, pursuant to the Court's instruction during the hearing, Defendant filed a Memorandum of Law in Support of the Delegation of Discretionary Authority to Plan Administrator Vincent Brigandi. (Doc. No. 19.) On April 23, 2015, the Court issued an Opinion ordering that the parties may conduct fact discovery only on the Plan Administrator's conflict of interest, and that the arbitrary and capricious standard of review applies in this case. (Doc. Nos. 20, 21.)

On September 29, 2015, the parties filed cross Motions for Summary Judgment (Doc. Nos. 27, 29), as well as Statements of Undisputed Facts (Doc. Nos. 28, 29-2.) On October 14, 2015, Defendant filed a Motion to Strike certain exhibits filed with Plaintiffs' Motion for

Summary Judgment. (Doc. No. 30.) Responses were filed to all Motions. (Doc. Nos. 31-33, 35-38.)

## III. STANDARD OF REVIEW

### A. Summary Judgment

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the Court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (quotation omitted)).

A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216 (internal quotation marks omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009) (quotation omitted)). The Court's task is not to resolve disputed issues of fact, but to determine whether

there exist any factual issues to be tried. Anderson, 477 U.S. at 247–249. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

"The same standards and burdens apply on cross-motions for summary judgment." Allah v. Ricci, 532 F. App'x 48, 50 (3d Cir. 2013). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).

**B. ERISA Arbitrary and Capricious Standard**

In an Opinion and Order dated April 23, 2015, this Court held that the "arbitrary and capricious" standard of review would apply to the claim in this case. Felker v. USW Local 10-901, No. CIV. A. 13-7101, 2015 WL 1867910, at *1 (E.D. Pa. Apr. 23, 2015).

Under the arbitrary and capricious standard, "a court must uphold an administrator's interpretation of a plan, even if it disagrees with it, so long as 'the administrator's interpretation is rationally related to a valid plan purpose and is not contrary to the plain language of the plan.'" Abramowicz v. Rohm & Haas Co., No. CIV. A. 00-4645, 2001 WL 1346404, at *6 (E.D. Pa. Oct. 30, 2001) (quoting Dewitt v. Penn–Del Directory Co., 106 F.3d 514, 520 (3d Cir. 1997)). Thus, a court may overturn an administrator's decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (citation and internal quotation marks omitted). This deferential review

"promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation." Conkright v. Frommert, 559 U.S. 506, 517 (2010). A decision is supported by substantial evidence if "there is sufficient evidence for a reasonable person to agree with the decision." Herbert v. PNC Fin. Servs. Grp., Inc., No. CV 14-04600, 2016 WL 465107, at *8 (E.D. Pa. Feb. 8, 2016) (quoting Courson v. Bert Bell NFL Player Ret. Plan, 214 F.3d 136, 142 (3d Cir. 2000)).

## IV.  ANALYSIS

In their Motion for Summary Judgment, Plaintiffs first argue that the evidence that the Court may consider extends "far beyond" the documents in the Administrative Record. (Doc. No. 27-1 at 7.) In doing so, they contend that in addition to the Administrative Record submitted by Defendant, the Court should also consider a binder of documents submitted to the Court by Plaintiffs. (Id. at 8.) Next, Plaintiffs argue that under the "arbitrary and capricious" standard of review, there is a high probability that a conflict of interest influenced the benefits decision to the detriment of Plaintiffs. Finally, Plaintiffs aver that the decision to deny severance benefits to Plaintiffs was arbitrary and capricious.

Defendant argues that Plaintiffs' claim for severance benefits under the Plan should be dismissed because Defendant's denial of the claim was reasonable. Defendant claims that the Plan Administrator alone made the decision to deny benefits, as well as the decision to uphold the denial of benefits on appeal, and a conflict of interest did not affect these decisions.

### A.  Consideration of Evidence Beyond the Administrative Record

As this Court has already ruled, it will not consider exhibits filed by Plaintiffs that are outside the Administrative Record and not related to the conflict of interest issue. See Felker, 2015 WL 1867910, at *10 ("For the reasons stated above, the arbitrary and capricious standard of review will be used in this case, and Plaintiffs will be permitted to conduct limited discovery

into the Plan Administrator's conflict of interest."); <u>see also</u> <u>Sivalingam v. Unum Provident</u> <u>Corp.</u>, 735 F. Supp. 2d 189, 196 (E.D. Pa. 2010) (additional discovery "must be circumscribed so as to preserve ERISA's goal of providing an inexpensive and expeditious means of resolving benefit disputes."); <u>Dandridge v. Raytheon Co.</u>, Civ. No. 08-4793, 2010 WL 376598, at *4 (D.N.J. Jan. 26, 2010) ("Thus, discovery beyond the administrative record is permissible if such discovery is directed toward uncovering the extent to which a structural conflict record has morphed into an actual conflict that could have influenced the administrator's discretionary decision."); <u>O'Sullivan v. Metro. Life Ins. Co.</u>, 114 F. Supp. 2d 303, 309 (D.N.J. 2000) ("If district courts permitted claimants to present additional evidence in reviewing benefits determinations, the administrator's review of claims [would] be circumvented.").

The Court has already established that it will not consider evidence beyond the Administrative Record that purports to contradict the findings of the Plan Administrator.[2] Therefore, outside evidence used to contradict facts will be stricken, and only outside evidence relating to the conflict of interest will be considered. It follows that the Court will not consider any factual averments in Plaintiffs' Statement of Undisputed Facts (Doc. No. 28) referring to the stricken exhibits.

In <u>Metropolitan Life Insurance Company v. Glenn</u>, the Supreme Court of the United States stated that if "a benefit plan gives discretion to an administrator or fiduciary who is

---

[2] Plaintiffs contend that, under the arbitrary and capricious standard of review, "the evidence that the Court may consider extends far beyond the documents that Sunoco has designated as the 'Administrative Record.'" (Doc. No. 27-1 at 7.) Plaintiffs assert that the Court may consider all information "known to the Plan Administrator" at the time of his decision, and urge the Court to follow a Fourth Circuit case that considered information acquired by employees of the corporation as well as books and records of the corporation. (<u>Id</u>. at 9 (citing <u>Helton v. AT&T,</u> <u>Inc.</u>, 709 F.3d 343 (4th Cir. 2013)).) The Court declines to follow <u>Helton</u>. Instead, it will consider "the record made before the plan administrator," as well as any evidence related to the alleged conflict of interest. See <u>Kosiba v. Merck & Co.</u>, 384 F.3d 58, 67 (3d Cir. 2004).

operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."  554 U.S. 105, 111 (2008) (quoting <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989)).  The Court instructed that "the significance of the conflict of interest factor will depend upon the circumstances of the particular case."  <u>Id.</u> at 106.  The Court elaborated as follows:

> [A conflict] should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

<u>Id.</u> at 117.

In <u>Howley v. Mellon Financial Corporation</u>, the Third Circuit explained:

> . . . A court may certainly "consider evidence of potential biases and conflicts of interest that is not found in the administrator's record."  <u>Id.</u>; <u>see also</u> <u>Burke v. Pitney Bowes Inc. Long-Term Disability Plan</u>, 544 F.3d 1016, 1028 (9th Cir. 2008) ("[T]he district court may consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest." (internal quotation marks omitted)).  The necessity for this exception is obvious.  A plan participant may be unaware of information relating to an administrator's conflict until well after the administrative process has ended, and a conflicted administrator, especially one whose decision-making has been affected by that conflict, is not at all likely to volunteer that information.  To allow an administrator the benefit of a conflict merely because it managed to successfully keep that conflict hidden during the administrative process would be absurd.
>
> Although we adopted this exception prior to the Supreme Court's decision in <u>Glenn</u>, it remains equally appropriate after <u>Glenn</u>.  <u>Glenn</u> directs a court to consider a conflict of interest as a factor in its analysis, and to afford that factor greater importance, perhaps determinative importance, where the evidence suggests a greater likelihood that it affected the decision to deny benefits.  128 S. Ct. at 2351.  For this legal standard to be meaningful, courts plainly must be willing to consider evidence relative to "the nature, extent, and effect on the

decision-making process of any conflict of interest" revealed during the litigation process. <u>Burke</u>, 544 F.3d at 1028.

625 F.3d 788, 793-94 (3d Cir. 2013).

Plaintiffs in this case have submitted hundreds of documents to supplement the Administrative Record. Plaintiffs argue that these documents are properly before the Court both under an arbitrary and capricious standard of review (Doc. No. 27-1 at 8-14), and to show that the Plan Administrator operated under a conflict of interest (<u>id.</u> at 14-30). As noted, the Court will only consider these documents to the extent they relate to "the nature, extent, and effect on the decision-making process of any conflict of interest." <u>Howley</u>, 625 F.3d at 793-94 (quoting <u>Burke</u>, 544 F.3d at 1028).

Certain documents submitted by Plaintiffs relate to whether the Plan Administrator made the right decision, rather than whether the Plan Administrator operated under a conflict of interest. These documents will not be considered. The exhibits that the Court considers outside the Administrative Record, and therefore inadmissible under the arbitrary and capricious standard, are Plaintiffs' Exhibits 6, 7, 8, 9, and 10 (notes from effects bargaining meetings); 11 and 13 (e-mails from Philadelphia Refinery to Plaintiffs); 15 (the Termination Agreement between Sunoco and the Union); and 69, 70, and 71 (Verified Statements of James Savage, Paul Felker, and William Dunbar). These exhibits will be disregarded because they constitute an improper attempt to supplement the Administrative Record.[3] <u>See Finlay v. Beam Glob. Spirits</u>

---

[3] While portions of the Verified Statements of Paul Felker and William Dunbar (Pls. Ex. 70, 71) relate to the issue of conflict of interest, they contain both hearsay and hearsay within hearsay. Hearsay is an out-of-court statement presented for the truth of the matter asserted. Fed. R. Evid. 801. Affidavits containing inadmissible hearsay are improper under Federal Rule of Civil Procedure 56. <u>See</u> Fed. R. Civ. P. 56 ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); <u>Keating v. Bucks Cty. Water & Sewer Auth.</u>, No. CIV. A. 99-1584, 2000 WL

& Wine, Inc., 872 F. Supp. 2d 730, 734 (N.D. Ill. 2012) ("But evidence beyond the administrative record that purports to contradict the findings of . . . the plan administrator is not considered. Accordingly, Finlay's statements of additional fact using outside evidence to contradict facts are disregarded; but those relating to the conflict of interest are considered."); Rust v. Elec. Workers Local No. 26 Pension Trust Fund, No. 3:10-CV-00029, 2011 WL 4565501, at *23 (W.D. Va. Sept. 29, 2011) ("The . . . affidavit improperly recites alleged documents that were not timely disclosed by Defendants; constitutes an improper attempt to supplement the administrative record; and includes inadmissible hearsay and hearsay within hearsay.").

Despite having held that it will only consider documents relating to the conflict of interest issue, the Court has considered the majority of the 73 supplemental exhibits filed by Plaintiff, including deposition testimony of the Plan Administrator and emails revealing the review process of the claim denial letter. (See Pls. Exs. 72, 16-67.)

## B. The Plan Administrator's Conflict of Interest

Plaintiffs allege that the Plan Administrator had a conflict of interest which affected his decision because Sunoco's outside and in-house labor counsel were the "actual decision makers"

---

1888770, at *3 (E.D. Pa. Dec. 29, 2000) ("Portions of affidavits containing inadmissible hearsay should also be disregarded."); Bowdoin v. Oriel, No. CIV. A. 98-5539, 2000 WL 134800, at *3 (E.D. Pa. Jan. 28, 2000) ("we are to disregard statements in affidavits which are not based on personal knowledge or those portions that contain inadmissible hearsay"). The Statements offered here refer to various statements by others that are offered for their truth. As such, those portions of the Statements are improper. Moreover, the Statements are otherwise improper because they purport to contradict the findings of the Plan Administrator.

Similarly, the lengthy notes of bargaining meetings (Pls. Ex. 6-10) are relevant to show that the Plan Administrator reached the wrong decision, not that he operated under a conflict of interest, and therefore will not be considered. Furthermore, the Plan states, "The terms of the Plan control over any other Company policies or any other supporting documentation." (R. at D-38.)

and the benefits claim and appeal were "evaluated solely from the interest of Sunoco." (Doc. No. 27-1 at 20.) Defendant counters that, though the Plan Administrator consulted others, the decision to deny benefits was his own. (Doc. No. 33 at 13.) As previously noted, <u>Glenn</u> requires courts to consider conflict of interest as one factor in the reasonableness analysis and "afford it greater importance where there is a likelihood that it affected the denial of benefits." <u>Feeko v. Pfizer, Inc.</u>, No. CIV. A. 11-4296, 2014 WL 6473265, at *5 (E.D. Pa. Nov. 18, 2014), <u>aff'd,</u> No. 14-4752, 2016 WL 66535 (3d Cir. Jan. 6, 2016).

There are two types of conflicts of interest in ERISA cases: structural and procedural. <u>Sivalingam v. Unum Provident Corp.</u>, 735 F. Supp. 2d 189, 195 (E.D. Pa. 2010). "'[S]tructural conflicts' relate to financial incentives inherent in a plan's design, such as where the same entity both funds and administers the benefits plan." <u>Id.</u> Defendant in this case has conceded that a structural conflict of interest exists because Sunoco both funded and administered the Plan. However, it notes that a structural conflict of interest "does not alter the standard of review for evaluating [the] decision to deny [Plaintiffs'] benefits." (Doc. No. 33 at 8 (quoting <u>Estate of Schwing v. Lilly Health Plan</u>, 562 F.3d 522, 525 (3d Cir. 2009).)

"A 'procedural' conflict focuses on how the administrator treated a particular claimant and may arise from case-specific factors and irregularities." <u>Atkins v. UPMC Healthcare Benefits</u>, Civ. No. 13-520, 2013 WL 6587170, at *3 (W.D. Pa. Dec. 16, 2013). Evidence of procedural conflict may include: "(1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability." <u>Mullica v. Minn. Life Ins. Co.</u>, Civ. No. 11-4034, 2013 WL 5429295, at *2 (E.D. Pa. Sept. 27, 2013) (citation and internal quotation marks omitted).

Although the instant case does not involve medical evidence, the points in Mullica provide guidance on what may constitute a procedural conflict.

Plaintiffs make several arguments urging the Court to find that a conflict of interest improperly influenced the Plan Administrator's decision to deny benefits. First, Plaintiffs argue that Sunoco's claim review structure "maximized the structural conflict of interest." (Doc. No. 27-1 at 18.) Plaintiffs claim that the structural conflict affected the benefits decision because: Sunoco is the Plan Administrator; severance benefits would have been paid out of Sunoco's assets; there was no trust fund associated with the Plan to pay benefits; the Plan Administrator was tasked with adjudicating both the initial claim and the appeal; and Sunoco's potential liability in this case was estimated at $2,000,000. (Id. at 18.) In response, Defendant avers that "[i]t is both common and proper under ERISA for a Plan Administrator to wear 'two hats.'" (Doc. No. 33 at 9.)

It is not improper under ERISA for one person to act both as an official of a company and as a plan administrator. See Payonk v. HMW Indus., Inc., 883 F.2d 221, 225 (3d Cir. 1989) ("when employers wear 'two hats' as employers and as administrators . . . they assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA."); In re Wilmington Trust Corp. ERISA Litig., 943 F. Supp. 2d 478, 492 (D. Del. 2013) ("Under ERISA, a fiduciary may wear two hats; specifically, the statute allows officers and employees of a company to serve as fiduciaries of the company's ERISA plans.").

Here, Brigandi understood that his role as Plan Administrator was that of a fiduciary. At his deposition, he was asked whether he understood that, as a fiduciary, part of his obligation when adjudicating claims and appeals was to "act solely in the interest of participants and

beneficiaries." (Pls. Ex. 72 at 35.)  The Plan Administrator responded that he understood his role as a fiduciary.  While it is true that any claims would have been paid from Sunoco's assets, there is no evidence that the Plan Administrator was unable to act in the interest of participants and beneficiaries in his role as Plan Administrator, and in fact he testified that he did.  For this reason, it cannot be said that the structural conflict negatively affected the Plan Administrator's fiduciary decision-making in this case.

Second, Plaintiffs assert that Sunoco "did not put in place *any* safeguards against biased outcomes to counter the structural conflict of interest." (Doc. No. 27-1 at 19 (emphasis in original).)  Specifically, Plaintiffs criticize Sunoco's decision to delegate review of the initial claim and the appeal to the same person. (Id. at 20.)  Defendant responds that ERISA does not require a company to have two different review bodies for a severance claim. (Doc. No. 33 at 17.)

Under ERISA, an employee benefit plan must "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503-1.  As part of the "full and fair review" of an adverse decision, a plan must provide claimants: (1) "the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits"; (2) "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits"; and (3) "a review that takes into account all comments, documents, records, and other information submitted by the claimant

relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."[4] Id.

The Plan Administrator explained the process by which he came to his decision at his deposition:

> [Plaintiffs' counsel]: Now, were there any safeguards in place within the structure of Sunoco to assure that you were [acting solely in the interest of participants and beneficiaries] since you also had any number of other non-fiduciary responsibilities to your employer?
> . . .
> [Plan Administrator]: Can you give me an example of [a] safeguard?
>
> [Plaintiffs' counsel]: Honestly, not the way this plan was structured, I can't.  I mean, I have seen other plans where, for example, one person makes the initial claims decision and then an appeal goes to somebody else.
> . . .
> [Plan Administrator]: Okay.
>
> [Plaintiffs' counsel]: There could be any number of other examples.  But the way this plan is structured, I'm at a loss, that's why I'm asking you the question.
>
> [Plan Administrator]: So the way I would view a safeguard would be that I would review the claim, give it a lot of thought, do investigation into the merits of the legal claim, seek assistance from a legal perspective, from those that are responsible for providing legal guidance to the plan, and then make the decision on my own based on all of the facts that I was able to gather.
>  . . .
> [Plaintiffs' counsel]: . . . what procedures or safeguards were in place to assure that the appeal was going to be given a fresh look given that you're the same person deciding the appeal, decided the original claim?
>
> [Plan Administrator]: So the way I can respond to that is I'm not sure that I can say that there's a fresh look.  But what does happen is when I get an appeal of my ruling, I review it as if it's a new claim.  And I go through the same facts and review as I did on the first claim, talk to the people that were involved, and then get legal advice, legal guidance from the folks that are responsible for providing legal guidance to the plan.

---

[4] As Defendant notes, ERISA does not require that decisions on a severance claim and on appeal be made by a different person.  ERISA only requires that procedure to be followed in the context of group health plans.  See 29 C.F.R. § 2560.503-1(h).

> [Plaintiffs' counsel]: Okay. And that's all there is? There are no other procedures?
>
> [Plan Administrator]: That is correct.

(Pls. Ex. 72 at 36-40.) Given the Plan Administrator's testimony regarding the claims procedure—including that he gathered information and legal advice, ultimately made a decision on his own based on the facts before him, and reviewed appealed rulings as if they were new claims—the Court finds that the safeguards in place were consistent with the requirements of ERISA.

Third, Plaintiffs argue that the Plan Administrator did not make the decision to deny benefits. Instead, they assert that Sunoco's outside and in-house counsel were the "actual decision makers" and that the claim and appeal were "evaluated solely from the interest of Sunoco." (Doc. No. 27-1 at 20.) Plaintiffs take issue with the fact that the Plan Administrator consulted Daniel Johns, Sunoco's outside labor counsel, who had written the October 12, 2012 letter responding to the letter from counsel for the Union. Therefore, according to Plaintiffs, the decision of the Plan Administrator was really the decision of Daniel Johns and other lawyers whom the Plan Administrator consulted in making his decision. Defendant responds that the Plan Administrator was the sole decision maker, and he did not need the approval of any other person. (Doc. No. 33 at 8.) Furthermore, Defendant maintains that "the Plan Administrator's consultations with others were appropriate and do not constitute an abdication of his decision making role." (Id. at 11.)

Plaintiffs are correct that the Plan Administrator's claim denial letter of January 22, 2013 includes the same arguments as Daniel Johns's October 12, 2012 letter. However, it is not surprising that the October 12, 2012 and January 22, 2013 letters were similar, because they

address the same questions regarding benefits.[5] In the October 22, 2012 claim letter, counsel for

Plaintiffs listed five portions of the October 12, 2012 letter of Daniel Johns, contesting each

portion and listing reasons that Plaintiffs were entitled to benefits. (R. at D-1-5.) Therefore, the

January 22, 2013 letter written by the Plan Administrator understandably addressed the same

points as Daniel Johns' October 12, 2012 letter.

Moreover, as noted above, the Plan Administrator stated at his deposition that though he

sought legal assistance from others, the decision was ultimately his own. (Pls. Ex. 72 at 36-40.)

ERISA does not require that plan administrators consult independent counsel, and courts in the

Third Circuit have concluded that it is proper for plan administrators to consult counsel within

the company. In Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan, the Third Circuit

stated:

> To begin with, the plaintiffs take issue with [the] fact that the Plan fiduciaries
> referred to Colt's counsel for advice rather than hiring independent counsel. As
> noted above, 29 U.S.C. § 1108(c)(3) specifically allows officers and others
> connected with the employer to serve as plan fiduciaries; given that Congress
> clearly contemplated administration of ERISA plans by employers, we think that
> if it had intended to impose a requirement that plan administrators consult outside
> counsel in the course of their administration, it would have made this intention
> clear in the statute. Not only is such a requirement nowhere to be found in
> ERISA, but plaintiffs can cite no caselaw to support their view that the fiduciaries
> here should have engaged independent counsel to aid them in interpretation and
> administration of the Plan.

854 F.2d 1516, 1531-32 (3d Cir. 1988); see also Estate of Schwing, 562 F.3d at 526 ("We note

that ERISA fiduciaries are not required to engage independent counsel to aid in their

---

[5] Plaintiffs contend that the October 3, 2012 letter from counsel for the Union to Elizabeth
Bilotta was the claim letter in this case. (Doc. No. 27-1 at 18.) However, the language of the
October 3, 2012 letter suggests otherwise. The letter was addressed to the Vice President of
Labor and Employee Relations, not the Plan Administrator, and does not state that it is a claim
for benefits. In contrast, the October 22, 2012 letter is addressed to the Plan Administrator and
states, "The Union is submitting this claim for benefits on behalf of the members of the Marcus
Hook Mobile Work Force . . ." (R. at D-1.) Thus, the October 3, 2012 letter cannot reasonably
be construed as a claim for benefits under ERISA.

interpretation and administration of an ERISA plan.").  The only case law offered by Plaintiffs in support of their argument that the Plan Administrator should have retained his own attorney instead of consulting attorneys retained by Sunoco is a case from the Western District of New York.  See Gill v. Bausch & Lomb Supplemental Ret. Income Plan I, 1 F. Supp. 3d 72, 93 (W.D.N.Y.), aff'd, 594 F. App'x 696 (2d Cir. 2014) (finding no fair and full review of plaintiff's claims where the plan administrator "at best served as a rubber-stamp to its counsels' interpretation of the Plan").  The Gill decision, however, appears to be inconsistent with the Third Circuit's decision in Ashenbaugh, which this Court is required to follow.

At his deposition, the Plan Administrator testified that he consulted Sunoco counsel "to make sure that the language was tight" and that his decision was legally supported.  (Pls. Ex. 72 at 95.)  He stated that he received commentary and edits from counsel through email and in person.  (Id. at 97.)  The Plan Administrator revised the claim denial letter based on suggestions from others as well as his own alterations.  (Id. at 97.)  The review process is reflected in the additional exhibits submitted to the Court by Plaintiffs.[6]  (See Pls. Ex. 22-42.)  There is no evidence that the Plan Administrator simply "rubber-stamped" legal counsels' interpretation of the Plan, and his choice to consult counsel during the process of drafting a response to Plaintiffs' letter was not inappropriate.

Fourth, Plaintiffs contend that the Plan Administrator ignored or withheld "information directly relevant but unhelpful to the arguments crafted to deny benefits."  (Doc. No. 27-1 at 29

---

[6] Twenty of the seventy-three additional exhibits submitted by Plaintiffs contain emails documenting the review by in-house and outside counsel for Sunoco of the Plan Administrator's written claim decision.  In the emails, the Plan Administrator exchanges messages with counsel for Sunoco and attaches various drafts of the claim denial letter as the edits are incorporated.  (Pls. Ex. 22-42.)  As the Plan Administrator testified at his deposition, he also consulted others in person, but could not locate notes of those review sessions.  (Pls. Ex. 72 at 56-57.)

(citing <u>Mullica</u>, 2013 WL 5429295, at *2 ("In the Third Circuit, evidence of a procedural conflict includes . . . self-serving selectivity in the use and interpretation of physicians' reports"); <u>Irgon v. Lincoln Nat. Life Ins. Co.</u>, No. CIV. A. 13-4731 FLW, 2013 WL 6054809, at *6 (D.N.J. Nov. 15, 2013) (procedural irregularities may include "failure to analyze all relevant diagnoses"); <u>Gill</u>, 1 F. Supp. 3d at 91 (finding violation of ERISA where relevant documents were not disclosed to plaintiffs, and where there was evidence that the decision was predetermined).)

In response, Defendant asserts that Plaintiffs had three opportunities to submit evidence to the Plan Administrator for consideration, and that "[t]here is no requirement that an ERISA administrator faced with an issue of who is to be believed must conduct an independent investigation into the veracity of each account."  (Doc. No. 33 at 17 (citing <u>Estate of Schwing</u>, 562 F.3d at 527).)  According to Defendant, Plaintiff could have submitted additional evidence along with either the October 3, 2012 Union letter to Sunoco, the October 22, 2012 initial claim letter, or the March 13, 2012 appeal letter.  (<u>Id.</u>)

The Administrative Record in this case may only be supplemented with evidence relevant to a conflict of interest, and this Court has noted that it will not consider evidence such as bargaining notes because they do not relate to a conflict of interest.  There is no indication that the Plan Administrator withheld evidence in this case, or that he lacked the necessary information to decide the claim.

Finally, Plaintiffs assert that the decision to deny benefits was "based entirely on [Sunoco's] own interests."  (Doc. No. 27-1 at 31.)   Plaintiffs quote the following passage from <u>Howley</u>, arguing that this case presents "a very similar situation":

> Here, the extra-record evidence considered by the district court was certainly relevant to assessing the extent of MFC's conflict of interest, and by inference, the effect of that conflict on its decision-making process. This evidence shows that while MFC was negotiating ACS's continued employment of Buck employees

under terms that seemingly mirrored the requirements of the sale of business exception, its subsidiary was helping ACS plan the immediate termination of 100 of those employees. This arrangement would have financially benefitted MFC in two ways. First, it allowed MFC to avoid paying Displacement Program benefits to 100 Buck employees by making it appear that their employment would continue uninterrupted at ACS. Second, it made the acquisition of Buck more appealing to ACS, because ACS knew that it could immediately slash costs by eliminating 100 of the employees it had agreed to employ. The existence of such a scheme—seemingly perfectly orchestrated to ensure that MFC would not have to pay, directly or indirectly, the cost of certain promised benefits—is surely evidence that a reasonable fact-finder could deem relevant to whether MFC's conflict of interest affected its decision to deny Howley's claim.

Howley, 625 F.3d at 794.

Howley is distinguishable from this case, and does not "give plaintiffs *carte blanche* to seek conflict of interest discovery beyond the Administrative Record." Irgon v. Lincoln Nat. Life Ins. Co., No. CIV.A. 13-4731 FLW, 2013 WL 6054809, at *5 (D.N.J. Nov. 15, 2013) ("Instead, the Third Circuit in *Howley* simply rejected a categorical bar from consideration of evidence outside of the record."). In Howley, a former employee sued his employer's parent corporation, alleging that he was denied benefits under the parent corporation's severance plan. 625 F.3d at 791. For years, Howley had worked for Buck, a subsidiary of Mellon Financial Corporation ("MFC"). Id. MFC then sold Buck to Affiliated Computer Systems, Inc. ("ACS"). Id. at 790. The severance benefit plan at issue in Howley was intended to help "displaced employees 'bridge the gap' between periods of employment or retirement income." Id. A "sale of business exception" to the plan made an employee ineligible for benefits if he was terminated pursuant to the sale of a subsidiary by MFC to another company that provided comparable employment to the employee. Id. Howley was terminated by Buck and reemployed by ACS when MFC sold Buck to ACS. However, he was terminated by ACS the next day. His claim for benefits under ERISA was denied because the plan administrator found that the aforementioned exception applied. Id. Because Howley's new employment with ACS "initially" was

comparable to his previous employment by Buck—that is, before he was terminated by ACS—he was not eligible for benefits under MFC's plan.  Id. at 796.  The district court granted summary judgment in Howley's favor, and the Third Circuit affirmed.  Id. at 798.

In its opinion affirming the decision of the district court, the Third Circuit noted that it was uncontested that Buck "colluded with ACS to plan Howley's termination in advance of the sale" of Buck to ACS.  Id. at 794.  The court further stated, "the sale of business exception exists because employees provided comparable employment by a buyer have no gap in employment that they need to bridge.  This is plainly not true, however, when the employment provided is de minimis."  Id. at 796.

In this case, there is no evidence of collusion to plan Plaintiffs' termination, let alone any evidence that Plaintiffs were terminated by PES.  Instead, Plaintiffs were hired by PES and given the same or better pay and benefits.  (See R. at D-3 (". . . following their termination by Sunoco Marcus Hook on September 7, they were hired without a period of unemployment by Philadelphia Energy Solutions"); R. at D-624 ("[PES] agrees to hire maintenance employees from the Marcus Hook mobile workforce who have been working temporarily at the Philadelphia Refineries."); R. at D-864 (stating that offers of employment would be made "at a base salary or base wage which is at least equal to that provided by Sunoco or its Contributing Subsidiaries immediately prior to the Closing Date").)  Therefore, the employment offered to Plaintiffs by PES was not de minimis.  For these reasons, Howley is not analogous, and does not support Plaintiffs' contention that the decision to deny Plaintiffs' claim was based solely on Sunoco's interests.   As will be discussed more thoroughly below, the decision to deny benefits was based primarily on the text of the Plan itself, and it did not produce the same unjust result as the plan administrator's decision in Howley.

Moreover, none of the factors cited in <u>Mullica</u> apply here: there is no evidence that the Plan Administrator reversed his position without additional evidence, selected evidence in a self-serving manner, disregarded recommendations of others, or requested additional unnecessary evidence. <u>See</u> <u>Mullica</u>, 2013 WL 5429295, at *2 (evidence of procedural conflict includes: "(1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability.").

## C. Review of the Plan Administrator's Decision

Plaintiffs argue that the decision to deny them benefits was arbitrary and capricious. Defendant maintains that the decision was reasonable. Under the arbitrary and capricious standard of review, "a plan administrator's interpretation of a plan may be disturbed only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." <u>Courson v. Bert Bell NFL Player Ret. Plan</u>, 214 F.3d 136, 142 (3d Cir. 2000) (quotations omitted). The arbitrary and capricious standard is "highly deferential," and the decision of the plan administrator should be upheld if "there is sufficient evidence for a reasonable person to agree with the decision." <u>Id.</u> (quotation omitted). The Court finds that the denial of Plaintiffs' claim was reasonable for two reasons. First, the conflict of interest in this case is not determinative. Second, the language of the Plan unambiguously does not provide for severance benefits.[7]

---

[7] In this case, the Plan Administrator considered the Plan, the Contribution Agreement, the Settlement Agreement, the Memorandum of Understanding Agreement, and information gathered from conversations with persons who had first-hand knowledge of the events underlying Plaintiffs' claim, as well as information submitted by Plaintiffs. (Doc. No. 29-1 at 9.)

The Third Circuit recently affirmed a decision finding that a denial of severance benefits under ERISA was not arbitrary or capricious. In <u>Feeko v. Pfizer, Inc.</u>, plaintiff-appellants sued their former employer for severance benefits. No. 14-4752, 2016 WL 66535, at *1 (3d Cir. Jan. 6, 2016). Plaintiffs were longtime employees of Wyeth, and also did work for Benchmark, a company that provided credit services to Wyeth. <u>Id.</u> at *2. The severance plan at issue in <u>Feeko</u> was created in anticipation of a corporate takeover of Wyeth by Pfizer. It provided that if an employee was terminated within two years of a "change in control" of the employer, the employee would be entitled to certain benefits. <u>Feeko v. Pfizer, Inc.</u>, No. CIV. A. 11-4296, 2014 WL 6473265, at *1 (E.D. Pa. Nov. 18, 2014), <u>aff'd,</u> No. 14-4752, 2016 WL 66535 (3d Cir. Jan. 6, 2016). An employee was entitled to benefits unless he was transferred to a "successor company of the Company." <u>Id.</u> The intent of the plan was to "provide certain employees . . . with benefits that will assist them with their transition during and following a Change in Control." <u>Id.</u>

The district court, in ruling on cross motions for summary judgment, upheld Pfizer's determination that plaintiff-appellants were not entitled to severance benefits. In doing so, it analyzed the effect of a conflict of interest on the plan administrator's decision to deny benefits. The plan administrator in <u>Feeko</u> was a committee of five senior-level Pfizer employees. The district court found that the committee members operated under a conflict of interest because three of the five members "had participated in drafting contract language that moved plaintiffs from Pfizer's payroll without exposing Pfizer to financial liability for severance benefits" and therefore they "had significant incentive to have their interpretation of the Severance Plan upheld." <u>Id.</u> at *6. Despite this "troubling" conflict of interest, the court upheld the plan administrator's decision to deny benefits. <u>Id.</u> at *9.

In this case, the conflict of interest is neither troubling nor determinative. The Plan Administrator testified that he alone made the decision to deny Plaintiffs' claim for severance benefits. When asked whether his decision had to be approved by anyone else—in this case or regarding any other claim for benefits—the Plan Administrator answered that it did not. (Pls. Ex. 72 at 31.)

Moreover, it was not improper for the Plan Administrator to wear "two hats" and serve as both the Plan Administrator under ERISA and a Sunoco official. See In re Wilmington Trust Corp. ERISA Litig., 943 F. Supp. 2d 478, 492 (D. Del. 2013) ("Under ERISA, a fiduciary may wear two hats; specifically, the statute allows officers and employees of a company to serve as fiduciaries of the company's ERISA plans."). Nor was it inappropriate for the Plan Administrator to consult counsel in making his decision. Ultimately, "[a]lthough conflicts play a role in determining the reasonableness of the denial of benefits, the ultimate question is whether the Committee's interpretation of the Plan itself was reasonable." Feeko, 2016 WL 66535, at *4. For reasons stated more thoroughly in the previous Section, the conflict of interest in this case is not determinative.

Next, considering the written terms of the Plan, "[i]n assessing whether benefits are due, the language of the Severance Plan itself is paramount." Feeko, 2014 WL 6473265, at *6; see also In re UNISYS Corp., 58 F.3d 896, 902 (3d Cir. 1995) ("The written terms of the plan documents control"). The Third Circuit has set forth five factors for courts to consider when assessing the reasonableness of a plan administrator's interpretation:

> (1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

<u>Howley</u>, 625 F.3d at 795 (citing <u>Moench v. Robertson</u>, 62 F.3d 553, 566 (3d Cir. 1995)).

Here, the Plan Administrator's decision was consistent with the goals of the Plan. The Plan was "intended to alleviate financial hardships which may be experienced by employees of the Company whose employment was terminated in connection with the Company's idling of the main processing units at its Marcus Hook Refinery." (R. at D-30.) Plaintiffs were not terminated in connection with Sunoco's idling of the main processing units at the Marcus Hook Refinery, but rather as a result of the creation of PES and the signing of the MOU. Furthermore, Plaintiffs' transition to PES was smooth and they did not experience any period of unemployment. Given that the Plan was intended to "alleviate financial hardships," the Plan Administrator's decision was consistent with the goals of Plan.

Likewise, the four remaining factors listed in <u>Howley</u> do not suggest that the Plan Administrator's decision was arbitrary or capricious. The Plan Administrator's decision that Plaintiffs were not entitled to severance benefits because they were not terminated in connection with the idling of the Marcus Hook Refinery's main processing units, and that they experienced no break in employment, would not render any other portion of the Plan meaningless or inconsistent. Nor is there any evidence that the Plan Administrator's interpretation conflicts with ERISA's requirements. There is no indication that the Plan Administrator has failed to interpret the Plan consistently. Instead, as the Plan Administrator noted in his appeal denial letter, "no similarity situated employee received severance benefits in connection with Sunoco's contribution of the assets of the Philadelphia Refinery or PES, as all Sunoco employees who became employees of PES as a result of the terms of the Contribution Agreement were provided with the same or better salary or wages." (R. at D-15.)

Finally, and most importantly, the Plan Administrator's interpretation is consistent with the plain language of the Plan. See Weiss v. Prudential Ins. Co. of Am., 497 F. Supp. 2d 606, 610 ("The Third Circuit . . . has outlined several factors for courts to consider in determining whether an interpretation of a plan is reasonable . . . the most important Moench factor is the fifth factor: the clear, plain language of the Plan") (quoting Moench, 62 F.3d at 566).

First, the Plan contains the following language: "The provision of severance benefits under the Plan is pursuant to a negotiated Settlement Agreement entered into between the Company and the Union as a result of Effects Bargaining Negotiations dated February 29, 2012." (R. at D-30.) It further states, "This document serves as both the official plan document and the summary plan description. The terms of the Plan control over any other Company policies or any other supporting documentation." (R. at D-38.) Therefore, the Plan clearly states that its bargained-for terms control severance benefit decisions.

Second, Plaintiffs cite the following portion of the Plan in support of their argument that they are entitled to severance benefits:

> This Plan only applies to those employees whose employment is terminated in connection with the Company's idling of the main processing units at the Refinery and transition to a terminal operation at the Refinery.
> . . .
>
> Severance benefits will not be applied to:
> . . .
>
> Employees who refuse to accept, whether with Sunoco or any of its affiliate companies, assignment to an equivalent position or a change in work location, provided that, for non-exempt employees, a change in work location does not increase the commute from their current residence to their new work location by at least 35 miles. An equivalent position is any position one salary grade lower, or of the same or higher salary grade, than the employee's present position. (This paragraph does not apply to employees who are part of the Mobile Work Force, as designated by the Company in its sole discretion, and who are transferred to a position at the Company's Philadelphia Refinery for a limited period time.)

(R. at D-31 (emphasis in original).)

The above paragraph is intended to apply to Sunoco employees who were terminated in connection with the idling of the main processing units at the Marcus Hook Refinery but did not accept employment with an affiliate company of Sunoco. The portion of the paragraph in parentheses applies to MWF employees who were transferred to the Philadelphia Refinery for a limited period of time and states that they are not excluded from severance benefit eligibility. According to Plaintiffs, because they were transferred for a limited period of time to Sunoco's Philadelphia Refinery, the parenthesized portion of the text should have applied to make them eligible for severance benefits. Defendant counters that the above paragraph does not apply to Plaintiffs because they were not terminated in connection with the idling of the main processing units at the Marcus Hook Refinery. (Doc. No. 29-1 at 12.)

Here, though Plaintiffs were originally assigned to the Philadelphia Refinery on a temporary basis, this employment was made permanent upon formation of the MOU. (See R. at D-624-25 ("The Company agrees to hire all active former USW represented employees currently employed by Sunoco at the Philadelphia Refineries. . . . The Company also agrees to hire maintenance employees from the Marcus Hook mobile workforce who have been working temporarily at the Philadelphia Refineries.").) It was therefore reasonable for the Plan Administrator to determine that Plaintiffs were not entitled to severance benefits under the plain language of the Plan.[8]

---

[8] In addition, the Settlement Agreement provides the following with regard to MWF employees:

**14. Mobile Work Force:**

Bargaining Unit employees who are currently classified as Mobile Work Force (MWF) employees who are not retained to work at the Marcus Hook Terminal Facility will be afforded the opportunity to be assigned on a temporary basis to

The Plan Administrator's decision was consistent with the objective and text of the Plan. Denial of severance benefits was in line with the Plan's stated purpose: "to alleviate financial hardships which may be experienced by employees of [Sunoco] whose employment is terminated in connection with [Sunoco's] idling of the main processing units at its Marcus Hook Refinery." (R. at D-30.) Plaintiffs' salary and benefits were largely unaffected by their becoming permanent employees of PES, and Plaintiffs experienced no period of unemployment. Plaintiffs were immediately employed by PES following their termination from Sunoco, and the transition was relatively smooth. Their responsibilities and place of work remained the same. The purpose of the Plan would not have been served had the Plan Administrator granted Plaintiffs' request for benefits. Had the Plan Administrator granted Plaintiffs' request for benefits, Plaintiffs would have received not only severance benefits from Sunoco but also benefits and salary provided by PES. Thus, the Plan Administrator's decision was neither arbitrary nor capricious. See Feeko v. Pfizer, Inc., No. 14-4752, 2016 WL 66535, at *5 (3d Cir. Jan. 6, 2016) ("Conversely, had the Company granted Appellants' request for severance benefits, they would have received severance benefits on top of the salary and benefits they were receiving from Benchmark. Such a scenario would appear to contradict, not conform to, the goals of the Plan."); Sejman v. Warner-Lambert Co., 889 F.2d 1346, 1350 (4th Cir. 1989) (granting severance benefits "would seem even more of a windfall, because it would award

---

work at the Philadelphia Refinery and work until laid off from such temporary assignment as determined by management. Employees will be given two week's [sic] notice of layoff date. Such employees will be eligible to receive enhanced Severance Benefits at the time of such layoff.

(R. at D-51.) Plaintiffs in this case were never given two weeks notice of a layoff, nor were they ever laid off. Thus, the denial of severance benefits was also consistent with the Settlement Agreement.

severance pay to persons who never changed their jobs and were never out of work"); <u>Lakey v. Remington Arms Co.</u>, 874 F.2d 541, 545 (8th Cir. 1989) (finding no violation of ERISA where employer "refused to grant severance pay to its ex-employees because the employees suffered no lack of work.").

Accordingly, the Court will uphold the decision of the Plan Administrator and grant summary judgment in favor of Defendant. <u>See</u> <u>Abramowicz v. Rohm & Haas Co.</u>, No. CIV. A. 00-4645, 2001 WL 1346404, at *6 (E.D. Pa. Oct. 30, 2001) (under the arbitrary and capricious standard, "a court must uphold an administrator's interpretation of a plan, even if it disagrees with it, so long as 'the administrator's interpretation is rationally related to a valid plan purpose and is not contrary to the plain language of the plan.'").

## V.     CONCLUSION

Considering the Administrative Record, the Memoranda of Law in Support of their Cross-Motions (Doc. Nos. 27, 29), the Responses in Opposition (Doc. Nos. 31, 33), and applying an arbitrary and capricious standard of review, the Court finds that Defendant's decision to deny Plaintiffs' claim for severance benefits was neither arbitrary nor capricious.    Therefore, Defendant's Motion for Summary Judgment (Doc. No. 29) will be granted, and Plaintiffs' Motion for Summary Judgment (Doc. No. 27) will be denied.  In addition, Defendant's Motion to Strike (Doc. No. 30) will be granted.

An appropriate Order follows.